**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) | |
| | ) | |
| Plaintiff, | ) | **Consolidated Cases** |
| | ) | |
| v. | ) | Civil Action No. 06-1988 (ESH) |
| | ) | |
| **DEPARTMENT OF HOMELAND SECURITY,** | ) | Civil Action No. 06-2154 (RBW) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

On February 8, 2007, plaintiff Electronic Frontier Foundation ("EFF") moved for partial summary judgment on the issue of expedited FOIA processing in these consolidated cases. Defendant Department of Homeland Security ("DHS") opposes plaintiff's motion and has cross-moved for partial summary judgment on the expedition issue. Defendant asserts 1) that EFF has failed to exhaust administrative remedies with respect to two of the three FOIA requests at issue here; and 2) that EFF failed to demonstrate that it is entitled to the expedited processing of its FOIA requests. We address these contentions in turn.

**I. Plaintiff Exhausted the Applicable Administrative Remedies**

Defendant initially asserts that "plaintiff did not exhaust its administrative remedies for the ATS Requests and therefore this Court lacks subject-matter jurisdiction over plaintiff's claim for expedited processing of these requests." Defendant's Memorandum in Support of its Motion for Partial Summary Judgment ("Def. Mem.") at 17 (citation omitted). The agency argues that an administrative appeal *must* be pursued before an aggrieved FOIA requester can obtain judicial review of an agency denial of a request for expedited processing. In asserting this claim, the

government resurrects arguments that were first made to this Court – and rejected – more than six years ago.  *See Al-Fayed v. CIA*, 2000 U.S. Dist. LEXIS 21476, at *7-8 (D.D.C. Sep. 20, 2000).  More recently, in 2004, this Court relied upon *Al-Fayed* and reiterated that the statute's "express provision" governing expedited processing "clearly indicates that judicial review is appropriate at either of two moments: when the agency has denied a request for expedited processing, or when the agency has, upon administrative appeal, affirmed the denial of such a request." *American Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 28 (D.D.C. 2004) ("*ACLU*") (citation and internal quotation omitted).[1]

Despite this clear and unambiguous precedent, the government invites the Court to "reexamine its position."  Def. Mem. at 19.  It is, of course, axiomatic that "[a] court should give considerable weight to its own previous decisions unless and until they have been overruled or undermined by the decision of a higher court or a statutory overruling," *Louisiana Wholesale Drug Co., Inc. v. Biovail Corp.*, 437 F. Supp. 2d 79, 83 n. 3 (D.D.C. 2006) (citation omitted), and that "considerations of stare decisis weigh heavily in the area of *statutory construction*," *In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12, 20 (D.D.C. 2001) (citation omitted; emphasis in original).  In any event, even if the Court were to accept the agency's invitation, the validity of its previous holdings would quickly become apparent.

---

[1] The Court in *ACLU* also relied upon *Elec. Privacy Info. Ctr. v. DOJ*, 241 F. Supp. 2d 5 (D.D.C. 2003) ("*EPIC*"), which likewise held that the submission of an administrative appeal is *not* a prerequisite to judicial review of an agency's denial of a request for expedited processing.  The *EPIC* decision was subsequently vacated when an appeal of the district court judgment was dismissed as moot.  *Elec. Privacy Info. Ctr. v. DOJ*, 2004 U.S. App. LEXIS 24617 (D.C. Cir., Nov. 24, 2004).  A more recent EPIC case applied the holding in *Al-Fayed* and *ACLU* to find that "[p]laintiff is not required to pursue an administrative appeal before seeking judicial review of its request for expedited processing of a FOIA request."  *Elec. Privacy Info. Ctr. v. DOD*, 355 F. Supp. 2d 98, 100 n.1 (D.D.C. 2004).

The Court's resolution of the exhaustion issue in *Al-Fayed* and *ACLU* was the result of a straightforward application of the plain language of the statute. Thus, in *Al-Fayed*, the Court began its analysis by noting that the FOIA "provides for 'expeditious consideration of administrative appeals of [agency] determinations of whether to provide expedited processing.'" *Id*. at *7, quoting 5 U.S.C. § 552(a)(6)(E)(ii)(II). The Court rejected the assertion of the defendant agencies that "this provision mandates administrative appeals for all denials of expedited processing before an applicant may seek judicial review." *Id*. Such a requirement, the Court found, would plainly conflict with FOIA's express language:

> the statute authorizes judicial review for challenges to "Agency action *to deny or affirm denial of* a request for expedited processing pursuant to this subparagraph . . . ." [5 U.S.C.] § 552(a)(6)(E)(iii) (emphasis added). This language of alternatives clearly indicates that judicial review is appropriate at either of two moments: when the agency has denied a request for expedited processing, or when the agency has, upon administrative appeal, affirmed the denial of such a request.

*Id*.

Defendant's disagreement with the holdings of *Al-Fayed* and *ACLU* is based almost entirely upon its misreading of *Oglesby v. United States Dep't of the Army*, 920 F.2d 57 (D.C. Cir. 1990), and its progeny, which the agency mischaracterizes as standing for the broad proposition that "full and timely exhaustion of administrative remedies is a prerequisite to judicial review" in *all* cases arising under FOIA. Def. Mem. at 18. A careful reading of *Oglesby*, however, shows that its holding was based squarely upon the specific language of statutory provisions (*i.e.*, those dealing with requests for "agency records") that are markedly different than the provisions at issue here (*i.e.*, those dealing with requests for "expedited processing"). Indeed, *Oglesby* actually supports the conclusion that FOIA's expedited processing language does *not*, as the Court found in *Al-Fayed* and *ACLU*, mandate an administrative appeal as a precondition of judicial review.

3

The D.C. Circuit began its analysis in *Oglesby* by noting that "absent a statutory provision to the contrary, failure to exhaust is by no means an automatic bar to judicial review . . . ." 920 F.2d at 61. The Court then examined the relevant statutory language to determine whether it did, in fact, provide for a mandatory administrative appeal. That language required an agency, after receiving a request for agency records, to:

> (i) determine within ten days (excepting Saturdays, Sundays, and legal public holidays) . . . whether to comply with such request and [the agency] shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination; and

> (ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

*Id.*, quoting 5 U.S.C. § 552(a)(6)(A)(i),(ii).[2]

Based upon that language, the Court found that "[t]he statutory scheme in the FOIA *specifically provides* for an administrative appeal process following *an agency's denial of a FOIA request*." *Id.* (emphasis added).[3]

The Court next considered the FOIA requester's assertion that he had constructively exhausted the applicable, mandatory administrative remedies, and reviewed the language of 5 U.S.C. § 552(a)(6)(C), which provides for constructive exhaustion where an agency "fails to

---

[2] The Electronic Freedom of Information Amendments of 1996, Pub. L. 104-231, amended FOIA to require an initial response to a request for agency records within *twenty* working days.

[3] Defendant's mischaracterization of the *Oglesby* holding is exemplified by its use of the following quotation: ("[c]ourts have consistently confirmed that the FOIA requires exhaustion of [the agency's] appeal process before an individual may seek relief in the courts"). Def. Mem. at 18, purporting to quote 920 F.2d at 61-62. The unaltered language states that "the FOIA requires exhaustion of *this* appeal process," (emphasis added), *i.e.*, the appeal process specifically mandated by 5 U.S.C. § 552(a)(6)(A) for agency *withholding* determinations.

comply with the applicable time limit provisions of [Sec. 552(a)(6)(A)]."    The Court concluded

that the mandatory remedies had not been exhausted because the agencies had responded to the

FOIA requests before suit was filed (albeit after the ten-day time limit) and the requester had not

submitted administrative appeals of the agencies' exemption claims and "no records" responses.

920 F.2d at 71.

It is thus clear that the Court's holding was based upon the express language of two FOIA

provisions that are wholly irrelevant here: "We therefore interpret 5 U.S.C. §§ 552(a)(6)(A) and

(C) as requiring the completion of the administrative appeal process before courts become

involved, if the agency has responded to the request before suit is filed."  *Id*. at 65.   Likewise, in

*Hidalgo v. Federal Bureau of Investigation*, 344 F.3d 1256 (D.C. Cir. 2003), upon which

defendant also relies, the D.C. Circuit cited the explicit language of Sec. 552(a)(6)(A)(ii) – "[i]f

the denial of the request is upheld on appeal, the agency must 'notify the person making such

request of the provisions for judicial review of that determination'" – and reiterated that "[a]s we

have previously concluded [in *Oglesby*], this statutory scheme 'requires each requestor to

exhaust administrative remedies.'"  *Id*. at 1259 (citations omitted).

There is no logical way in which *Oglesby*, *Hidalgo* or defendant's other cited cases can

be applied to the very different statutory scheme that Congress created for expedited processing

requests in 1996 (six years after *Oglesby* was decided).  Indeed, the statutory provisions

applicable to expedited processing are clearly distinguishable from the provisions at issue in

those cases:

- Unlike Sec. 552(a)(6)(A)(i), which the D.C. Circuit interpreted in *Oglesby*, Sec. 552(a)(6)(E)(ii)(I), the provision relating to initial agency responses to requests for expedited processing, does *not* require agencies to notify a requester "of the right . . . to appeal to the head of the agency any adverse determination."

5

- Unlike Sec. 552(a)(6)(A)(ii) (*Oglesby*), Sec. 552(a)(6)(E)(ii)(II), the provision relating to administrative appeals of expedited processing determinations, does *not* require agencies to notify a requester "of the provisions for judicial review of that determination under [Sec. 552(a)(4)]."

- Unlike Sec. 552(a)(6)(A)(ii) (*Oglesby*), Sec. 552(a)(6)(E)(ii)(II) does *not* require agencies to "make a determination with respect to any appeal within twenty days." Rather, the latter section merely provides for "expeditious consideration of administrative appeals of . . . determinations whether to provide expedited processing."[4]

- Unlike Sec. 552(a)(6)(C), the exhaustion provision at issue in *Oglesby*, Sec. 552(a)(6)(E)(iii) does *not* reference administrative appeals, but refers only to agency failure to "respond in a timely manner to . . . a request" for expedited processing.[5]

Given the inapplicability of the provisions construed in *Oglesby* to the expedited processing context, it is not at all surprising that Congress established a separate and distinct statutory scheme when it created a right to expedition in 1996. That scheme, which the Court applied in *Al-Fayed* and *ACLU*, contemplates judicial review of "[a]gency action *to deny or affirm denial of* a request for expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis

---

[4] The lack of a specific agency time limit also renders an exhaustion requirement inappropriate. *See McCarthy v. Madigan*, 503 U.S. 140, 147 (1992) (exhaustion not required where there is an "indefinite timeframe for administrative action") (citations omitted). *See also Schaeuble v. Reno*, 87 F. Supp. 2d 383, 390 (D.N.J. 2000) ("the Privacy Act does not bind the INS to any definite timeframe for administrative action, which weighs in favor of waiving the exhaustion requirement") (citation omitted).

[5] Sec. 552(a)(6)(C) refers to "the applicable time limits of this paragraph," *i.e.*, the time limits established under Sec. 552(a)(6)(A), which relate to "a request to any agency for records under paragraph (1), (2), or (3) of this subsection." Requests for expedited processing are not requests "for records" and do not arise "under paragraph (1), (2), or (3) of this subsection."

added).  Such an approach is wholly consistent with Congress' desire to expedite agency

handling of qualifying FOIA requests, a goal expressed not only in the substance of the

expedited processing provision, but also in the procedural aspects of the statutory framework.

Those procedures seek to ensure an extremely rapid resolution of a requester's claimed

entitlement to expedited processing.  Thus, an agency must render a decision on an expedition

request within ten *calendar* days, as opposed to the twenty *working* days allowed for a

determination on a records request.[6]  There is no provision for an extension of that time limit, as

there is under Sec. 552(a)(6)(B) for responses to requests for records.  And, as we have shown,

there is no mandatory administrative appeal, but rather an elective appeal procedure for

requesters who wish to pursue it.[7]

The two-step exhaustion requirement that the government urges is clearly inconsistent

with Congress' intent to ensure fast resolution of claims for expedited processing.[8]  "Where a

---

[6] The ten calendar day time limit, coupled with the right of judicial review upon "failure by an agency to respond in a timely manner," 5 U.S.C. § 552(a)(6)(E)(iii), shows that Congress contemplated resort to the district court in little over a week even where an agency has not yet addressed the expedition issue.

[7] Defendant asserts that "[i]t is hard to fathom that Congress would not have been more explicit if it meant to allow requestors to bypass the administrative process and go straight to court to challenge expedition denials."  Def. Mem. at 20.  First, many requesters lack the resources to pursue litigation, so it is not at all "hard to fathom" why Congress would provide for an optional appeals procedure to provide such requesters with an inexpensive opportunity to seek further review of an adverse decision.  Second, requiring a mandatory appeal would clearly frustrate the goal of rapidly resolving expedition requests in those cases where the requester has the ability to "bypass" the appeals procedure and seek judicial review.  Finally, there is nothing exceptional about providing an optional administrative remedy that need not be exhausted; as the D.C. Circuit emphasized in *Oglesby*, "failure to exhaust is by no means an automatic bar to judicial review," 920 F.2d at 61.

[8] The circumstances surrounding a request for expedited process further distinguish a case such as this from the setting of *Oglesby*.  Indeed, the D.C. Circuit observed that "[a] requester who waits long past the [statutory] deadline for the agency's response and then brings suit without

statutory requirement of exhaustion is not explicit, 'courts are guided by congressional intent in determining whether application of the doctrine would be consistent with the statutory scheme.'" *Coit Independence Joint Venture v. Federal Sav. and Loan Ins. Corp.*, 489 U.S. 561, 579 (1989) (quoting *Patsy v. Florida Bd. of Regents*, 457 U.S. 496, 502 n.4 (1982)). *See also* 489 U.S. at 580 ("a court should not defer the exercise of jurisdiction under a federal statute unless it is consistent with [congressional] intent") (citation omitted).[9] Here, not only is there no explicit "statutory requirement of exhaustion," but there is, as the Court previously has recognized, clear language authorizing judicial review of agency action without resort to an administrative appeal. Even in the absence of that language, under *Coit*, the congressional intent that there be rapid adjudication of expedition claims would control and a two-step exhaustion requirement would be inappropriate.

It is not at all surprising that Congress crafted a different statutory scheme for judicial review of expedited processing requests. First, as we have noted, the crux of the dispute in such cases involves the timeliness of agency action and thus requires expedited resort to the courts. Second, an expedited processing case comes to the court in a very different posture than does a case like *Oglesby*, where the agency has completed its processing of the FOIA request but not considered the requester's challenge to the results of that processing. In such a case, the agency has not yet had an opportunity to review the requester's arguments concerning the withholding of

---

administrative appeal has by his actions indicated that time cannot be of the essence." 920 F.2d at 65. Here, in contrast, time is clearly of the essence and forms the basis of the right at issue.

[9] Even before Congress established a right to expedited processing, the D.C. Circuit recognized that "full[] and fast[]" disclosure of information was central to FOIA's statutory scheme. *See, e.g., Oglesby*, 920 F.2d at 64 n.8 ("Congress adopted the time limit provision in the FOIA 'in order to contribute to the fuller and faster release of information, which is the basic objective of the Act'"), quoting H.R. Rep. No. 876, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6285, 6289.

records or a "no records" determination. The administrative appeal is the first point in the standard FOIA process where the requester presents factual and/or legal reasons why the result of the agency's search for, and review of, responsive records was flawed. *See*, *e.g*., *Dettmann v. United States Dep't of Justice*, 802 F.2d 1472, 1477 n.8 (D.C. Cir. 1986) (where requester had not filed an administrative appeal challenging an aspect of the agency's handling of her request, court should not "decide an issue which the FBI never had a fair opportunity to resolve prior to being ushered into litigation") (citation omitted). As the record here demonstrates, a request for expedited processing provides the agency with a clear articulation of the requester's position and an opportunity to consider it fully.

Given the very different postures of cases like *Oglesby* and its progeny, on one hand, and *Al-Fayed*, *ACLU* and this case, on the other, the "jurisprudential" considerations cited in *Hidalgo* are inapplicable here. *See* Def. Mem. at 22 ("[r]equiring appeals of expedition decisions . . . also serves the important policies underlying FOIA's exhaustion requirement") (citing *Hidalgo*). Because the agency has already had an opportunity to fully consider plaintiff's argument in support of expedition, judicial review would not "premature[ly] interfere[] with agency processes," nor would it prevent the compilation of "a record which is adequate for judicial review." *Id*.

In summary, the two-step exhaustion requirement that the government proposes conflicts with the clear, unambiguous language of the statute and would frustrate Congress' intent that expedition disputes be quickly resolved. It would also invite needless litigation as courts would be called upon to decide whether agency actions on administrative appeals were "timely" within

the meaning of the statute.[10]  For these reasons, the Court should follow its holdings in *Al-Fayed* and *ACLU* and, as it did there, reject the government's argument.[11]

Finally, it is important to note that defendant lacks credibility when it touts the benefits of requiring administrative appeals of expedited processing decisions, as its actions in this case demonstrate that such a requirement would needlessly delay the resolution of expedition disputes.  In its discussion of the administrative proceedings on plaintiff's "Interim Agreement Request," the agency glosses over the fact that plaintiff *did* file an appeal concerning the expedition of that request (Exhibit C to plaintiff's motion for partial summary judgment), and the

---

[10] *See* 5 U.S.C. § 552(a)(6)(E)(iii) ("failure by an agency to respond in a timely manner to such a request shall be subject to judicial review") (emphasis added).  Given that FOIA merely provides for "expeditious consideration of administrative appeals of . . . determinations whether to provide expedited processing," *id.*, § 552(a)(6)(E)(ii)(II), it is unclear when exhaustion of the appeals process would occur if, as defendant asserts, the judicial review provision applies "where the agency denies expedited processing, the requestor appeals, and the agency does not timely respond to the appeal."  Def. Mem. at 19-20.  Should the courts construe "expeditious consideration" of appeals to mean ten calendar days, as the statute expressly provides for agency action on requests for expedited processing?  Or does it mean some period shorter than the twenty working days that FOIA specifically mandates for administrative appeals not involving expedited processing?  It is likely that the government would challenge a lawsuit filed upon expiration of ten calendar days after submission of an appeal on the ground that Congress declined to specify such a time limit for appeals while it did so for requests.  The litigation of that issue would further frustrate the legislative scheme designed to resolve expedition disputes quickly.  Hence the wisdom of the principle that exhaustion is not required where, as here, there is an "indefinite timeframe for administrative action."  *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992) (citations omitted).

[11] In support of its position, defendant DHS cites its own regulation, 6 C.F.R. § 5.9(c), which purports to require an administrative appeal as a precondition of judicial review.  Def. Mem. at 19.  That provision, which conflicts with the clear statutory language, adds little to the Court's analysis of the issue.  The D.C. Circuit has "emphasize[d] that [courts] owe no particular deference to [an agency's] interpretation of FOIA."  *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1313 (D.C. Cir. 2003), citing *Tax Analysts v. Commissioner*, 117 F.3d 607, 613 (D.C. Cir. 1997) (court "will not defer to an agency's view of FOIA's meaning"). In any event, "[a]n invalid regulation cannot confer jurisdiction."  *Espenschied v. Merit Systems Protection Board*, 804 F.2d 1233, 1238 (Fed. Cir. 1986); *see also Romulus v. United States*, 983 F. Supp. 336, 343 n.7 (E.D.N.Y. 1997) ("regulations cannot confer jurisdiction in the absence of a grant of statutory authority").

agency failed to render a decision on the appeal.  Defendant's Answer to Plaintiff's Amended

Complaint (Civ. No. 06-1988), ¶ 26 "("defendant has not formally responded to plaintiff's

administrative appeal").  Indeed, the agency did not respond to the appeal within the generally

applicable 20-working-day period, let alone "expeditiously," as both the statute, 5 U.S.C. §

552(a)(6)(E)(ii)(II), and the agency's own regulations, 6 C.F.R. § 5.5(d)(4), require.  It is thus

clear that there would have been absolutely no benefit to the parties or the Court if plaintiff had,

as the agency suggests, submitted an administrative appeal of the agency decision to deny the

requests for expedited processing of plaintiff's Automated Targeting System requests.

## II.  Plaintiff Demonstrated its Entitlement to Expedited Processing of its Requests

Defendant asserts that plaintiff has failed to show that the FOIA requests at issue here are

entitled to expedited processing because 1) plaintiff is not primarily engaged in disseminating

information; and 2) there is no urgency to inform the public about the subject matter of the

requests.  As we demonstrated in our opening memorandum, both conditions for expedition

have, in fact, clearly been met.  We now briefly respond to the agency's arguments.

As an initial matter, we note that defendant seeks to enter into the record material that

government counsel recently created or acquired during the course of litigating the pending

motions.  *See* Declaration of John R. Coleman, ¶¶ 6 ("web page that I downloaded . . . on

February 19, 2007"); 7 ("copy of a Guidestar Basic Report . . . that I downloaded . . . on

February 21, 2007"); 8 ("copy of a Google News search conducted by me on February 16,

2007"); 9 (same); 10 (same); 11 ("copy of a press roundtable . . . that I downloaded on February

16, 2007"); 12 ("copy of the Source Information for the major Newspapers database within

Lexis-Nexis, which I downloaded . . . on February 21, 2007"); 13 ("copy of the search results of

a search . . . conducted by me on February 21, 2006").  This newly acquired material, proffered

in an attempt to rationalize agency decisions rendered on November 1, 2006, and December 14, 2006, is not properly before the Court.  The statute unambiguously provides that judicial review of agency expedition decisions "shall be based on the record before the agency at the time of the determination."  5 U.S.C. § 552(a)(6)(E)(iii).  *See generally Public Service Co. v. Interstate Commerce Comm.*, 749 F.2d 753, 759 (D.C. Cir. 1984), citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 92-95  (1943) ("an agency's decision must reflect the reasons for its action, and . . . subsequent rationalizations cannot be substituted . . . for contemporaneous reasoned decisionmaking").  There is no indication that any of the proffered material was "before the agency" when it denied plaintiff's requests for expedited processing.  Rather, "the record before the agency" consisted solely of the material submitted by plaintiff, all of which appears in the exhibits that accompany plaintiff's motion.

### A.  <u>EFF is "Primarily Engaged in Disseminating Information"</u>

The gist of defendant's argument with respect to the "primarily engaged" component of the "urgency to inform" standard is that "an organization can have only one 'primary' activity." Def. Mem. at 26.  Building upon that cramped reading of the statutory language, the agency asserts that plaintiff's representation that "[o]ne of EFF's primary objectives is 'to educate the press, policymakers and the general public about online civil liberties'" is fatally flawed and shows that the organization is not "primarily engaged in disseminating information."  *Id.* at 27. While superficially appealing, defendant's simplistic formulation flies in the face of the legislative history, the agency's own regulations and the precedent of this Court.

Oddly, defendant embraces the language of the House Report on the 1996 FOIA amendments, which makes plain that information dissemination "need not be [the] sole" activity of a qualifying FOIA requestor, but that "[a] requestor who only *incidentally* engages in

12

information dissemination, besides other activities, would not satisfy this requirement."  H.R.

Rep. No. 104-795, at 26 (emphasis added).  By no stretch of the imagination can it be argued that

EFF "only incidentally engages in information dissemination."

As the undisputed record before the agency shows, plaintiff represented under penalty of

perjury as follows:

> EFF routinely and systematically disseminates information in several ways.
>
> First, EFF maintains a frequently visited web site, http://www.eff.org, which received 40,681,430 hits in September 2006 — an average of 56,501 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.
>
> EFF has regularly published an online newsletter, the EFFector, since 1990.  The EFFector currently has more than 77,000 subscribers.  . . .
>
> Furthermore, EFF publishes a blog that highlights the latest news from around the Internet.  DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology.  . . .  DeepLinks had 538,297 hits in September 2006.
>
> In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002.  These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.
>
> EFF has also published several books to educate the public about technology and civil liberties issues.  *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages . . .  EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998) . . .  Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public.  . . .
>
> Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts.  *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues.  . . .

Exhibit A (attached to plaintiff's motion) at 3-4 (footnote omitted).

As we explained in our opening memorandum, defendant's acknowledgement that EFF qualifies as a "news media" requester for fee purposes is wholly inconsistent with its suggestion that the organization is "only incidentally engage[d] in information dissemination." Indeed, while the agency attempts to contort its meaning, it is clear that the relevant DHS regulation – like the regulations of other federal agencies – recognizes that "news media" entities presumptively qualify as being "primarily engaged in disseminating information." The regulation states, in pertinent part, that a requester seeking expedition under the "urgency to inform" standard, "*if not a full-time member of the news media*, must establish that he or she is a person whose main professional activity or occupation is information dissemination, though it need not be his or her sole occupation." 6 C.F.R. § 5.5(d)(3) (emphasis added). In other words, a "full-time member of the news media" need *not* demonstrate anything more with respect to his or her dissemination activities, while a part-time employee of a media entity or a freelancer is required to make the requisite showing. Here, the agency has recognized that EFF is a "representative of the news media" because it is an "entity that is organized and operated to publish or broadcast news to the public."[12] Given that the FOIA requests at issue were submitted

---

[12] The parties have entered a stipulation in C.A. No. 06-1988 that provides, in pertinent part:

> Defendant DHS has granted news media status to Plaintiff EFF based on the representations contained in EFF's FOIA requests, which demonstrate that EFF is an "entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6). Defendant DHS will continue to regard Plaintiff EFF as a "representative of the news media" absent a change in circumstances that indicates that EFF is no longer an "entity that is organized and operated to publish or broadcast news to the public." 6 C.F.R. § 5.11(b)(6).

Stipulated Dismissal of Plaintiff's Second Cause of Action (February 27, 2007), ¶ 1.

"on behalf of" EFF, *see* Exhibits A, E & F (attached to plaintiff's motion), the "full-time" issue does not arise because the news media entity itself is the requester.[13]

As we have noted, the common sense conclusion that a "news media" requester likewise satisfies the "primarily engaged" standard has been adopted by this Court in *American Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24 (D.D.C. 2004), where the Court held that the Electronic Privacy Information Center ("EPIC") was "primarily engaged in the dissemination of information." In so holding, the Court cited its earlier decision finding that EPIC qualified for "news media" fee status. *Id.* at 29 n.5, citing *Elec. Privacy Info. Ctr. v. Dep't of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003). Defendant attempts to distinguish EPIC's status from EFF's by asserting that the Court merely "gave a synopsis of EPIC's activities by citing a case that granted EPIC news media fee status." Def. Mem. at 26 n.19. Even if defendant is correct in its characterization of the Court's reliance on its earlier decision, a comparison of EFF's dissemination "activities" with those of EPIC demonstrates that EFF engages in a greater amount of dissemination and has done so for a longer period of time:

- EPIC publishes "a bi-weekly electronic newsletter that is distributed to over 15,000 readers" and which "has been published continuously since 1994." 241 F.

---

[13] Defendant seeks to discount the fact that other agencies' regulations, as we have shown, Pl. Mem. at 17-18, explicitly recognize that "news media" requesters are likewise "primarily engaged in disseminating information." Def. Mem. at 26 n.19 (citing *Al-Fayed*, 254 F.3d at 307). The court of appeals in *Al-Fayed*, in the language defendant cites, explained that no single agency possesses special expertise with respect to expedited processing. The court elaborated: "Were district courts required to defer to agency determinations of 'compelling need,' they would have to affirm disparate (albeit, reasonable) decisions reached by different agencies . . ." 254 F.3d at 307. In this regard, plaintiff notes that, subsequent to the filing of its opening memorandum, EFF was informed that the National Security Agency has granted a request to expedite one of plaintiff's FOIA requests on the basis of an "urgency to inform the public," thus finding that EFF is "primarily engaged in disseminating information." Exhibits J & K, attached to Declaration of David L. Sobel ("Sobel Decl."). As such, defendant is asking this Court to affirm the "disparate" decision of DHS that plaintiff is *not* "primarily engaged in disseminating information."

Supp. 2d at 13. EFF "has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers." Exhibits A, E & F.

- "EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues." 241 F. Supp. 2d at 11. EFF has "published several books to educate the public about technology and civil liberties issues," and its "staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002." Exhibits A, E & F.

- EPIC "maintain[s] a heavily visited Web site that highlights the 'latest news' concerning privacy and civil liberties issues." 241 F. Supp. 2d at 8. EFF "maintains a frequently visited web site . . . which received 40,681,430 hits in September 2006 — an average of 56,501 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues." Exhibits A, E & F.

- The Court's description of EPIC's dissemination activities made no mention of a blog or podcasts used to disseminate information. EFF "publishes a blog that highlights the latest news . . . [which] had 538,297 hits in September 2006" and "has begun broadcasting podcasts [consisting of] a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues." *Id.*

It is thus clear that defendant's attempt to minimize the precedential weight of the Court's holding with respect to EPIC in the *ACLU* case in fact demonstrates that EFF is "primarily engaged in disseminating information."[14]

---

[14] Defendant asserts that in *ACLU* "this Court did not conclude that there is a connection between being news media for fee purposes and being primarily engaged in disseminating information for purposes of expedition," and goes on to say that, "[i]f the Court did indeed make such a connection, defendant respectfully requests that it reexamine its previous position in light of the arguments put forth in these papers." Def. Mem. at 26 n.19. Once again, plaintiff urges the Court to decline the government's invitation to disturb its precedent and reiterates that "[a]

While the government seeks to distinguish (or have the Court "reexamine") the holding in *ACLU*, it has simply chosen to ignore the Court's recent decision in *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005), which we cited in our opening memorandum.  Pl. Mem. at 18 n.14.  There, as we noted, this Court found that the Leadership Conference on Civil Rights is "primarily engaged in disseminating information" based upon some of the same kinds of activities EFF relies upon here.  The Court relied upon the facts that the organization "disseminates information regarding civil rights and voting rights to educate the public, promote effective civil rights laws, and ensure their enforcement by the Department of Justice," and that its website "serve[s] as the site of record for relevant and up-to-the minute civil rights news and information."  404 F. Supp. 2d at 260.  Implicitly rejecting the government's argument here that "an organization can have only one 'primary' activity,"  Def. Mem. at 26, the Court held that the organization is "primarily engaged in disseminating information" notwithstanding the fact that "[t]he Conference's mission is to promote the enactment and enforcement of effective civil rights legislation and policy." 404 F. Supp. 2d at 250 n.2.[15]

---

court should give considerable weight to its own previous decisions unless and until they have been overruled or undermined by the decision of a higher court or a statutory overruling," *Louisiana Wholesale Drug Co.*, 437 F. Supp. 2d at 83 n. 3 (citation omitted).

[15]  It is, of course, overly formalistic – and contrary to common usage – to suggest that "an organization can have only one 'primary' activity."  Indeed, in a Federal Register notice published just this week, defendant DHS wrote the following in describing a component of the National Incident Management System ("NIMS"): "*One of the primary functions* of the NIMS Integration Center is to ensure NIMS remains an accurate and effective management tool through refining and adapting compliance requirements to address ongoing preparedness needs." Department of Homeland Security, Federal Emergency Management Agency, Agency Information Collection Activities: Proposed Collection; Comment Request, 72 Fed. Reg. 8762 (February 27, 2007) (emphasis added).

Application of the Court's relevant precedent amply demonstrates that plaintiff is "primarily engaged in disseminating information" for purposes of expediting its FOIA requests. The agency's contrary determination cannot be sustained.[16]

### B. Plaintiff Demonstrated an "Urgency to Inform the Public" About the Subject Matter of Its FOIA Requests

Finally, defendant argues that plaintiff has "failed to demonstrate an urgency to inform the American public regarding either the Interim Agreement or the Automated Targeting System." Def. Mem. at 28. In making this argument, defendant notes that, "[i]mportantly, this Court's review of whether plaintiff's request[s] satisfied the 'urgency to inform' standard is restricted to the record as it existed before DHS when it denied plaintiff's expedition request[s]," and acknowledges that "[t]he record is comprised of plaintiff's initial FOIA requests as well as its appeal of the denial of its request for expedited processing of the Interim Agreement Request." *Id*. at 29 (citations omitted). As noted, pp. 11-12, *supra*, plaintiff agrees that judicial review is restricted to the record that was before the agency and thus objects to the government's attempt to introduce material that was not part of that record. *See* Declaration of John R. Coleman. It is clear that "the record as it existed before DHS" at the time of its decision clearly established that there was the requisite "urgency to inform the public."

---

[16] While attempting to minimize *ACLU*, and ignoring *Leadership Conference*, the agency instead relies upon *ACLU-NC v. Dep't of Justice*, Case No. C 04-4447, 2005 WL 588354 (N.D. Cal. March 11, 2005), an unpublished decision from another district. Def. Mem. at 26-27. As this Court recently admonished, "an unpublished district court opinion from another district . . . should not [be] cited to let alone relied upon." *DBI Architects, P.C. v. Am. Express Travel Related Servs. Co.*, 462 F. Supp. 2d 1, 6-7 (D.D.C. 2006) (citation omitted). In any event, the court in *ACLU-NC* "question[ed]" whether the requester was "primarily engaged in disseminating information," but does not appear to have decided the issue.

### 1. __The Passenger Data Negotiations ("Interim Agreement") Request__

Defendant's argument with respect to plaintiff's Interim Agreement request rests entirely upon the contention that the subject matter of the request is of little or no interest to the *American* public, but is rather an issue that solely concerns Europeans. While it is certainly true that the U.S. government's demand for personal data concerning European airline passengers has been particularly controversial in Europe, it is naïve to suggest that such foreign discontent is of no consequence to the American public.

The agency concedes, as it must, that there is "an ongoing debate," *ACLU v. Department of Justice*, 321 F. Supp. 2d 24, 29 (D.D.C. 2004), with respect to DHS's acquisition of passenger data. Def. Mem. at 30 ("the *debate* over whether the government should have access to PNR data contained in airline reservation systems to aid the government in its quest to prevent further terrorist attacks is simply one part of *the larger debate over the appropriate balance between national security and personal privacy*") (emphasis added). Defendant then asserts, perhaps wishfully but without any apparent support, that "[i]n the United States, the particular debate over the transfer of PNR data to the government came to a head and was resolved in November 2001" with passage of the Aviation and Transportation Security Act. *Id.* (emphasis removed).

As we have noted, Secretary Chertoff discussed the "very substantial debate" surrounding the issue (which he characterized as "fundamental") when he described the recently concluded negotiations with the European Union on November 17, 2006, just two weeks after the agency issued its initial determination denying plaintiff's request for expedition. Pl. Mem. at 20; Exhibit D (attached to plaintiff's motion). The Secretary's remarks are significant for two reasons. First, they demonstrate the continuing nature of the "very substantial debate" on a "fundamental" issue, contrary to defendant's assertion here that the debate "came to a head and was resolved in

November 2001." Second, the venue the Secretary chose for his remarks – a domestic audience at the Federalist Society's Annual Lawyers Convention – as well as the content of his speech, confirm that the debate is of "current exigency to the American public." *Al-Fayed*, 254 F.3d at 310. The Secretary discussed what he described as "an increasingly activist, left-wing, and even elitist philosophy of law that is flourishing not in the United States but in foreign courts and in various international courts and bodies." Exhibit D. He then went on to explain why such foreign developments are critical in the domestic realm:

> So now you're scratching your head and you're asking yourself, why does the Secretary of Homeland Security care about this? Well, in my domain, much of what I do actually intertwines with what happens overseas. And what happens in the world of international law and transnational law increasingly has an impact on my ability to do my job and the ability of the people who work in my department to do their jobs. And I'll give you a recent example.

> Some of you may have followed in the press that there was a difference of opinion between the European Union and the United States about the use of something called passenger name record data . . . .

*Id*.

There can be no dispute that, as Secretary Chertoff acknowledged, the outcome of the upcoming re-negotiation of the U.S.-EU passenger data agreement will have "an impact . . . on the ability of the people who work in [the Department of Homeland Security] to do their jobs." Defendant's attempt to suggest that the issue lacks *domestic* importance should be rejected. As in *ACLU*, 321 F. Supp. 2d at 30, and *Leadership Conference*, 404 F. Supp. 2d at 260, plaintiff's Interim Agreement request implicates a time-sensitive and "very substantial" debate on a "fundamental" policy issue. Plaintiff thus established the requisite "urgency to inform the public" and is entitled to expedited processing of the request.[17]

---

[17] The remainder of defendant's argument seeks to undermine the validity of the Google News search results plaintiff submitted to the agency in support of its expedition request. In support of

## 2. <u>The Automated Targeting System Requests</u>

The basis of defendant's argument with respect to plaintiff's two requests for information concerning the Automated Targeting System ("ATS") is that the agency has successfully "run out the clock" and it is now too late for the Court to provide any meaningful relief. Def. Mem. at 36 ("the December 4 [public comment] deadline . . . has already passed, and thus no relief given by this Court would be able to satisfy plaintiff's desire to have the documents [before the deadline]"); 37 ("the December 29 [extended] deadline has passed and thus no relief given by this Court would be able to satisfy plaintiff's desire to have the documents before December 29"). This argument fails for several reasons. First, as both parties have noted, the Court's review of the agency's action "shall be based on the record before the agency *at the time of the determination*." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added). "[A]t the time of the determination" – December 14, 2006 – the extended deadline for public comments on the ATS was still more than two weeks away. The government's argument, if accepted, would encourage agencies to delay decisions on expedited processing as long as possible and then argue, as defendant does here, that the "urgency" has passed and expedition is no longer necessary.[18]

In any event, defendant is mistaken when it suggests that the Court is now unable to grant meaningful relief. Contrary to defendant's assertion that "there is no pending legislation" relating to the ATS, as plaintiff has noted, Pl. Mem. at 24, Sens. Leahy, Feingold and Sununu have introduced the Federal Agency Data Mining Reporting Act of 2007 in direct response to

---

its argument, defendant relies upon non-record material that is not properly before the Court, *See* 5 U.S.C. 552(a)(6)(E)(iii).

[18] The government's desire to require "exhaustion" of an administrative appeal would, of course, further delay determinations and increase the likelihood that disputes over expedited processing would drag on for so long that agencies could simply wait out the asserted "urgency."

media revelations concerning the ATS.  This is precisely the kind of Congressional action that

plaintiff anticipated in its request for expedited processing, where it cited "Congressional

consideration of the [ATS] when the new Congress convenes in January" as a basis for the

expeditious disclosure of responsive agency records.  Exhibit F (attached to plaintiff's motion).

The very real probability of legislative activity concerning the ATS (which has now been

realized) was part of "the record before the agency at the time of [its] determination" and creates

a continuing "urgency to inform the public."[19]

Defendant seeks to downplay the significance of the initial Congressional criticism of the

ATS that was expressed just prior to the submission of plaintiff's second FOIA request on

December 6, 2006, asserting that "[t]he public statements of two senators and one congressman

are insufficient" to establish the likelihood that the ATS was very soon going to be the subject of

Congressional inquiry and legislative action.  Def. Mem. at 38.  The significance of those

statements was apparent, however, given that one of the senators was the incoming Chairman of

the Senate Judiciary Committee and the congressman was the incoming Chairman of the House

Homeland Security Committee.  Exhibit F (attached to plaintiff's motion).  The government's

argument is particularly disingenuous given its reliance on the fact that the deadline for public

comment on the ATS "has already passed."  On the one hand (public comment period),

defendant asserts that plaintiff's FOIA requests were submitted *too late* to have an impact on the

public debate,  while on the other hand (Congressional action), it complains that the requests

---

[19] In light of the agency's decision to "aggregate" plaintiff's two ATS requests "to simplify
processing," Exhibit G (attached to plaintiff's motion), the "record before the agency" with
respect to *both* requests includes the material plaintiff submitted in support of its two requests for
expedition.  As such, the pendency of Congressional action, which became apparent shortly
before plaintiff submitted its second request, was "before the agency" at the time it rendered its
decision to deny expedited processing of the "aggregated" requests.

were submitted *too early* because the legislative activity that plaintiff correctly anticipated had not yet occurred.  The agency cannot have it both ways.

In addition to the pendency of the Federal Agency Data Mining Reporting Act of 2007, the agency's own pending actions with respect to the ATS also establish a continuing "urgency" with respect to the disclosure of the requested information.  In response to an inquiry from plaintiff concerning the status of a Notice of Proposed Rulemaking ("NPRM") relating to the ATS, a DHS official recently informed plaintiff that "it is still in process."  Sobel Decl., ¶¶ 4-6; Exhibit L (attached thereto).[20]  It is thus disingenuous for the agency to assert that there is no longer any need to inform the public about the ATS because its initial public comment period concerning the system has expired.  The agency clearly intends to initiate further notice and rulemaking actions with respect to ATS, and it should not be permitted to thwart plaintiff's request for expedited disclosure of relevant information that will permit an informed public debate on those imminent actions.  In light of pending legislation involving the ATS, as well as the administrative actions concerning the system that are "still in process," this case is not, as defendant suggests, "similar" to  *Long v. Dep't of Homeland Security*, 436 F. Supp. 2d 38 (D.D.C. 2006), where the Court found that the requester had "failed to identify an imminent

---

[20]  To date, the agency has only published a Privacy Act "System of Records Notice" ("SORN") with respect to the collection and use of personally-identifiable information in the Automated Targeting System.  71 Fed. Reg. 64543 (November 2, 2006).  The SORN states the agency's intention to exempt the system from various provisions of the Privacy Act.  *Id.* at 64546.  The legislative history of the Privacy Act specifies that an agency, in order to promulgate such exemptions, must initiate a "public rulemaking process."  S. Rep. No. 93-3418, at 75 (1974).  The SORN published on November 2 did not purport to be a notice of proposed rulemaking, and the cited correspondence between plaintiff and the agency indicates that such a rulemaking is forthcoming.  *Compare* ATS SORN (no reference to proposed rulemaking) *with* Department of Homeland Security, Privacy Act of 1974: Implementation of Exemptions; Redress and Response Records System, 72 Fed. Reg. 2209 (January 17, 2007) ("Notice of proposed rulemaking . . . to exempt portions of the Redress and Response Records System from one or more provisions of the Privacy Act") (attached to Sobel Decl. as Exhibit M).

23

action indicating that the requested information will 'not retain its value if procured through the normal FOIA channels.'" *Id.* at 43 (citation omitted).[21]

Finally, defendant's effort to discount the significance of the media attention that was devoted to the ATS at the time of plaintiff's request is unavailing. First, the government seeks to minimize the significance of the fact that a Google News search returned approximately 900 relevant news articles by relying on material that was not before the agency and is thus not properly before the Court, Def. Mem. at 40-41. *See* p. 20 n.17, *supra*. Second, defendant contends that Exhibit H (attached to plaintiff's motion), which shows that DHS officials were provided with "talking points" to prepare them for media inquiries about the ATS, "is not part of the record and, therefore, should not be considered by the Court." Def. Mem. at 41 n.23 (citations omitted). "[T]he D.C. Circuit has held that facts within an agency's knowledge are part of the record before the agency at the time it reviews a FOIA request, whether or not the requester specifically referenced such facts." *Elec. Privacy Info. Ctr. v. DOD*, 355 F. Supp.2d at 103 n.7 (citing *Nat'l Treasury Employees Union v. Griffin*, 811 F.2d 644, 648 (D.C. Cir. 1987); other citations and internal quotation marks omitted). Given that Exhibit H is an internal DHS e-mail message dated December 4, 2006 (two days before plaintiff submitted its second request), "there can be little doubt that the agency was aware of [the material] when considering Plaintiff's request for expedition." *Id.* The agency cannot so easily pretend that it was unaware of the very significant news media interest – and controversy – surrounding the ATS at the time it denied the

---

[21] Tacitly acknowledging that there is, in fact, current legislative consideration of the ATS, defendant asserts that "[p]laintiff is still able to lobby Congress with the great wealth of publicly available information." Def. Mem. at 42 (citing the SORN and Privacy Impact Assessment released by the agency). However, as we have noted, Pl. Mem. at 22-23, "a meaningful and truly democratic debate . . . cannot be based solely upon information that the Administration voluntarily chooses to disseminate." *Elec. Privacy Info. Ctr. v. DOJ*, 416 F. Supp. 2d 30, 41 n.9 (D.D.C. 2006) (citation and quotations omitted).

request to expedite processing.  The Court should find that the record before the agency clearly established that there was an "urgency to inform the public" about the Automated Targeting System.

## **Conclusion**

For the foregoing reasons, and those set forth in plaintiff's opening memorandum, plaintiff's motion for partial summary judgment on the issue of expedited processing should be granted and defendant's cross-motion for partial summary judgment should be denied.[22]

Respectfully submitted,


  /s/ David L. Sobel
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar No. 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

---

[22] Plaintiff respectfully reiterates its request for the Court's expeditious consideration of this matter.  *See* Pl. Mem. at 23-25.  Defendant's assertion that the Court's ability to grant meaningful relief diminishes with the passage of time underscores the time-sensitivity of the statutory right that plaintiff seeks to vindicate in this action.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** | ) | |
| | ) | |
| Plaintiff, | ) | **Consolidated Cases** |
| | ) | |
| v. | ) | Civil Action No. 06-1988 (ESH) |
| | ) | |
| **DEPARTMENT OF HOMELAND SECURITY,** | ) | Civil Action No. 06-2154 (RBW) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S RESPONSE TO STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Local Rules 7(h) and 56.1, plaintiff Electronic Frontier Foundation ("EFF" or "plaintiff") respectfully submits this response to defendant's statement of material facts in support of its motion for partial summary judgment.

Plaintiff agrees that the material facts described in ¶¶ 1-7 of defendant's statement are not in dispute.

Respectfully submitted,

_/s/ David L. Sobel_
DAVID L. SOBEL
D.C. Bar No. 360418

MARCIA HOFMANN
D.C. Bar No. 484136

ELECTRONIC FRONTIER FOUNDATION
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
(202) 797-9009

Counsel for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION,** ) | |
| ) | |
| Plaintiff, ) | **Consolidated Cases** |
| ) | |
| v. ) | Civil Action No. 06-1988 (ESH) |
| ) | |
| **DEPARTMENT OF HOMELAND SECURITY,** ) | Civil Action No. 06-2154 (RBW) |
| ) | |
| Defendant. ) | |
| _____ ) | |

<u>**DECLARATION OF DAVID L. SOBEL**</u>

1.  I am co-counsel for plaintiff in the above-captioned actions and I provide this declaration as part of plaintiff's opposition to defendant's motion for partial summary judgment on the issue of expedited processing.  The statements contained in this declaration are based upon my personal knowledge.

2.  By letter to the National Security Agency ("NSA") dated January 23, 2007, plaintiff requested expedited processing of a Freedom of Information Act request on the ground that the request pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity."  A true and correct copy of plaintiff's letter to NSA is attached hereto as Exhibit J.

3. By letter to plaintiff dated February 6, 2007, NSA informed plaintiff that "your request for expedited treatment has been accepted." A true and correct copy of NSA's letter to plaintiff is attached hereto as Exhibit J.

4. On February 6, 2007, I sent an e-mail message to Toby Milgrom Levin, Senior Advisor in the Privacy Office of the Department of Homeland Security.  I asked Ms. Levin about

the status of agency action concerning the Automated Targeting System ("ATS") and noted that I "recalled discussion of an NPRM (Notice of Proposed Rulemaking).

5.  Ms. Levin responded to my e-mail later in the day on February 6, 2007, and wrote, "Yes, it is still in process."

6.  Exhibit L (attached hereto) is a true and correct copy of the e-mail exchange I had with Ms. Levin on February 6, 2007.

7.  Exhibit M (attached hereto) is a true and correct copy of a Notice of Proposed Rulemaking published by defendant on January 17, 2007, concerning proposed exemptions from provisions of the Privacy Act for a system of records maintained by the agency.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

March 1, 2007                         _/s/ David L. Sobel_____
                                      DAVID L. SOBEL

# Exhibit J

***Electronic Frontier Foundation v. Dep't of Homeland Security***
**Civil Actions Nos. 06-1988 & 06-2154**

**Plaintiff's Opposition to Defendant's Cross-Motion for Partial Summary Judgment**



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

January 23, 2007

**BY FACSIMILE — (301) 688-4762**

National Security Agency
ATTN: FOIA Office (DC34)
9800 Savage Road STE 6248
Ft. George G. Meade, MD 20755-6248

        RE:   Freedom of Information Act Request and
                Request for Expedited Processing

Dear Sir or Madam:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the National Security Agency on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

On January 9, 2007, the Washington Post reported:

> When Microsoft introduces its long-awaited Windows Vista operating system this month, it will have an unlikely partner to thank for making its flagship product safe and secure for millions of computer users across the world: the National Security Agency.

> For the first time, the giant software maker is acknowledging the help of the secretive agency, better known for eavesdropping on foreign officials and, more recently, U.S. citizens as part of the Bush administration's effort to combat terrorism. The agency said it has helped in the development of the security of Microsoft's new operating system -- the brains of a computer -- to protect it from worms, Trojan horses and other insidious computer attackers.

Alec Klein and Ellen Nakashima, "For Windows Vista Security, Microsoft Called in Pros," *Washington Post*, Jan. 9, 2007, at D01 (attached hereto).

We are seeking all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to information that "is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity." 32 CFR § 286.4(d)(3)(ii). According to DOD regulations, information is "urgently needed" when it "has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest." 32 CFR § 286.4(d)(3)(ii)(A). The information we request easily satisfies this standard.

The government activity at issue here — the NSA's involvement in the configuration of Microsoft's latest operating system — raises serious questions about the Department of Defense's interest in Vista's development. Indeed, the NSA's involvement in the system's configuration has already attracted substantial media interest since the publication of the *Washington Post* story. Specifically, a Google News search for "Vista and 'National Security Agency'" returned 67 results from news outlets throughout the world since January 9, 2007 (see first page of Google News search results attached hereto).

Furthermore, the *Washington Post* reported that Microsoft plans to make Vista available to consumers on January 30, 2007, and the system will likely be used by more than 600 million computer users by 2010. Thus, the information we request is unquestionably the subject of a breaking news story of general public interest particularly in the days leading to the product launch.

The purpose of this request is to obtain information directly relevant to the NSA's involvement in Vista's development, which has attracted considerable interest from the press and public in the past several days. The information we request is the subject of a breaking news story of general public interest, and therefore clearly meets the standard for expedited processing set forth in DOD regulations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a "representative of the news media" pursuant to the FOIA and 32 C.F.R. § 286.28(e)(7). In requesting this classification, we note that the Department of Homeland Security has recognized that EFF qualifies as a "news media" requester, based upon the publication activities set forth below (see DHS letter, attached hereto). We further note that the U.S. Court of Appeals for the D.C. Circuit has stressed that "different agencies [must not] adopt inconsistent interpretations of the FOIA." *Al-Fayed v. CIA*, 254 F.3d 300, 307 (D.C. Cir. 2001), quoting *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1287 (D.C. Cir. 1983).

2

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[1] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[2] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 39,237,901 hits in December 2006 — an average of 52,739 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 455,660 hits in December 2006.[3]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 5,000 times from EFF's web site last month.

---

[1] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGs Report.do?npoId=561625 (last visited Jan. 17, 2007).

[2] *Id.*

[3] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 32 C.F.R. § 286.28(d). To determine whether a request meets this standard, Department of Defense components determine whether disclosure of the requested information "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 32 C.F.R. §§ 286.28(d)(3)(i), (ii). This request easily satisfies these criteria.

First, disclosure of the requested information "will significantly contribute to the public understanding of the operations or activities of the Department of Defense." 32 C.F.R. § 286.28(d)(3)(i)(A). EFF has requested information that will shed light on the NSA's involvement in development of the Windows Vista operating system, which constitutes an activity of the Department of Defense.

Second, the "informative value" of the records EFF has requested is likely to be meaningful. 32 C.F.R. § 286.28(d)(3)(i)(B). We are seeking details about the NSA's collaboration with Microsoft to configure Vista. The details of this relationship are unlikely to be duplicative of information about NSA's operations and activities already in the public domain.

Third, the requested material will contribute to the general public's understanding of the nature and extent of the NSA's contribution to Vista's development. 32 C.F.R. § 286.28(d)(3)(i)(C). This information will contribute not only to EFF's understanding of the NSA's involvement in the configuration of the operating system, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will contribute significantly to the public's knowledge and understanding of the NSA's work with Microsoft on Vista. 32 C.F.R. § 286.28(d)(3)(i)(D). Little is publicly known about this relationship, so disclosure of the requested information will help inform the public about its terms and significance.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 32 C.F.R. § 286.28(d)(3)(ii). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

4

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 12. As the FOIA provides, I will anticipate a determination on this request for expedited processing within ten (10) calendar days.

Sincerely,

Marcia Hofmann
Staff Attorney

attachments

5

# Exhibit K

***Electronic Frontier Foundation v. Dep't of Homeland Security***
**Civil Actions Nos. 06-1988 & 06-2154**

**Plaintiff's Opposition to Defendant's Cross-Motion for Partial Summary Judgment**



**NATIONAL SECURITY AGENCY**
**CENTRAL SECURITY SERVICE**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

FOIA Case:  52276
6 February 2007

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, NW
Suite 650
Washington, DC  20009

Dear Ms. Hofmann:

This is an initial response to your Freedom of Information Act (FOIA) request submitted via facsimile on 23 January 2007, which was received by this office on 24 January 2007, for all agency records (including, but not limited to, electronic records) related to the NSA's review of and input on the configuration of the Microsoft Windows Vista operating system ("Vista").  Your request has been assigned Case Number 52276.

As we began to process your request, we realized that the first page of the actual request was missing from your 18-page facsimile package.  On 1 February 2007, a member of my staff contacted you to advise you of this fact. As a result, you submitted another facsimile of your original five-page request, which we received and have begun to process.  There is certain information relating to this processing about which the FOIA and applicable Department of Defense (DoD) and NSA/CSS regulations require we inform you.

For purposes of this request and based on the information you provided in your letter, you are considered a representative of the media.  Unless you qualify for a fee waiver or reduction, you must pay for duplication in excess of the first 100 pages.  Your request for a fee waiver has been granted.  In addition, please be advised your request for expedited treatment has been accepted.  We are currently in the process of searching for responsive documents and will notify you of the status of your request as soon as that search has been completed.

Correspondence related to your request should include the case number assigned to your request, which is included in the first paragraph of this letter. Your letter should be addressed to National Security Agency, FOIA Office

FOIA Case:  52276

(DC34), 9800 Savage Road STE 6248, Ft. George G. Meade, MD  20755-6248 or may be sent by facsimile to 443-479-3612.  If sent by fax, it should be marked for the attention of the FOIA office.  The telephone number of the FOIA office is 301-688-6527.

Sincerely,

for Marianne Stupar

PAMELA N. PHILLIPS
Chief
FOIA/PA Office

# Exhibit L

***Electronic Frontier Foundation v. Dep't of Homeland Security***
**Civil Actions Nos. 06-1988 & 06-2154**

**Plaintiff's Opposition to Defendant's Cross-Motion for Partial Summary Judgment**

**Subject:** RE: Fw: DHS Information Sharing Memo Public
**From:** "Levin, Toby" <Toby.Levin@dhs.gov>
**Date:** Tue, 6 Feb 2007 11:12:20 -0500
**To:** "David Sobel" <sobel@eff.org>

Yes, it is still in process.

-----Original Message-----
From: David Sobel [mailto:sobel@eff.org]
Sent: Tuesday, February 06, 2007 8:00 AM
To: Levin, Toby
Subject: Re: Fw: DHS Information Sharing Memo Public


Thanks.  On another matter, should we be expecting something on ATS?
I recall discussion of an NPRM.

- D.

--

.........................................................
David L. Sobel, Senior Counsel      *   202 797 9009 x10 (v)
Electronic Frontier Foundation      *   202 797 9066 (f)
1875 Connecticut Ave., NW Suite 650 *   sobel@eff.org
Washington, DC 20009   USA          *   http://www.eff.org
.

# Exhibit M

***Electronic Frontier Foundation v. Dep't of Homeland Security***
**Civil Actions Nos. 06-1988 & 06-2154**

**Plaintiff's Opposition to Defendant's Cross-Motion for Partial Summary Judgment**

(b) The notice must inform the respondent that he or she may be represented by a representative of the respondent's choice and that if the respondent wishes to have such a representative, the respondent must designate the representative in writing.

(c) The agency must serve the notice of proposed action upon the respondent by mail or hand delivery no less than 30 days prior to the effective date of the proposed action to the respondent's last known residence or duty station.

(d) If the respondent is employed in a position covered by this part on the date the notice is served, the respondent is entitled to be retained in a pay status during the notice period.

### § 731.403   Answer.

A respondent may answer the charges in writing and furnish documentation and/or affidavits in support of the answer. To be timely, a written answer must be submitted no more than 30 days after the date of the notice of proposed action.

### § 731.404   Decision.

The decision regarding the final action must be in writing, be dated, and inform the respondent of the reasons for the decision and that an unfavorable decision may be appealed in accordance with subpart E of this part. If the decision requires removal, the employing agency must remove the appointee from the rolls within 5 work days of the agency's decision.

## Subpart E—Appeal to the Merit Systems Protection Board

### § 731.501   Appeal to the Merit Systems Protection Board.

(a) *Appeal to the Merit Systems Protection Board.* When OPM or an agency acting under delegated authority under this part takes a suitability action against a person, that person may appeal the action to the Merit Systems Protection Board (hereinafter "Board"). If the Board finds that at least one of the charges brought by OPM or an agency against the person is supported by a preponderance of the evidence, regardless of whether all specifications are sustained, it must affirm the suitability determination and the suitability action.

(b) *Appeal procedures.* The procedures for filing an appeal with the Board are found at part 1201 of this title.

## Subpart F—Savings Provision

### § 731.601   Savings provision.

No provision of the regulations in this part is to be applied in such a way as to affect any administrative proceeding

pending on [DATE OF THE EFFECTIVE DATE OF THE FINAL RULE]. An administrative proceeding is deemed to be pending from the date of the agency or OPM "notice of proposed action" described in §§ 731.302 and 731.402.

[FR Doc. E7–592 Filed 1–17–07; 8:45 am]

**BILLING CODE 6325–39–P**

## DEPARTMENT OF HOMELAND SECURITY

### Office of the Secretary

### 6 CFR Part 5

**[Docket Number DHS–2007–0003]**

### Privacy Act of 1974: Implementation of Exemptions; Redress and Response Records System

**AGENCY:** Privacy Office, Office of the Secretary, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Department of Homeland Security is amending its regulations to exempt portions of a new system of records from certain provisions of the Privacy Act. Specifically, the Department proposes to exempt portions of the Redress and Response Records System from one or more provisions of the Privacy Act because of criminal, civil and administrative enforcement requirements.

**DATES:** Comments must be received on or before February 20, 2007.

**ADDRESSES:** You may submit comments, identified by Docket Number DHS–2007–0003 by one of the following methods:

• *Federal e-Rulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Facsimile:* 866–466–5370.

• *Mail:* Hugo Teufel III, Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528.

**FOR FURTHER INFORMATION CONTACT:** Hugo Teufel III, Chief Privacy Officer, Privacy Office, Department of Homeland Security, Washington, DC 20528; telephone 571–227–3813; facsimile: 866–466–5370.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department of Homeland Security (DHS), elsewhere in this edition of the **Federal Register**, published a Privacy Act system of records notice describing records in the DHS Redress and Response Records System. This system maintains records

for the DHS Traveler Redress Inquiry Program (DHS TRIP), which is the traveler redress mechanism being established by DHS in connection with the Rice-Chertoff Initiative, as well as in accordance with other policy and law. DHS TRIP will facilitate the public's ability to provide appropriate information to DHS for redress requests when they believe they have been denied entry, refused boarding for transportation, or identified for additional screening by DHS components or programs at their operational locations. Such locations include airports, seaports, train stations and land borders. DHS TRIP will create a cohesive process to address these redress requests across DHS.

DHS TRIP will serve as a mechanism to share redress-related information and facilitate communication of redress results across DHS components. It will also facilitate efficient adjudication of redress requests. Once the information intake is complete, DHS TRIP will facilitate the transfer of or access to this information for the DHS components or other agencies redress process, which will address the redress request.

This system contains records pertaining to various categories of individuals, including: individuals seeking redress or individuals on whose behalf redress is sought from DHS; individuals applying for redress on behalf of another individual; and DHS employees and contractors assigned to interact with the redress process.

No exemption shall be asserted with respect to information submitted by and collected from individuals or their representatives in the course of any redress process associated with this System of Records.

This system, however, may contain records or information recompiled from or created from information contained in other systems of records, which are exempt from certain provisions of the Privacy Act. For these records or information only, in accordance with 5 U.S.C. 552a (j)(2), (k)(1), (k)(2), and (k)(5), DHS will also claim the original exemptions for these records or information from subsections (c)(3) and (4); (d)(1), (2), (3), and (4); (e)(1), (2), (3), (4)(G) through (I), (5), and (8); (f), and (g) of the Privacy Act of 1974, as amended, as necessary and appropriate to protect such information. Moreover, DHS will add these exemptions to Appendix C to 6 CFR Part 5, DHS Systems of Records Exempt from the Privacy Act. Such exempt records or information may be law enforcement or national security investigation records, law enforcement activity and encounter records, or terrorist screening records.

DHS needs these exemptions in order to protect information relating to law enforcement investigations from disclosure to subjects of investigations and others who could interfere with investigatory and law enforcement activities. Specifically, the exemptions are required to: preclude subjects of investigations from frustrating the investigative process; avoid disclosure of investigative techniques; protect the identities and physical safety of confidential informants and of law enforcement personnel; ensure DHS' and other federal agencies' ability to obtain information from third parties and other sources; protect the privacy of third parties; and safeguard sensitive information.

In addition, because such investigations may arise out of DHS programs and activities, information in this system of records may pertain to national security and related law enforcement matters. In such cases, allowing access to such information could alert subjects of such investigations into actual or potential criminal, civil, or regulatory violations, and could reveal, in an untimely manner, DHS' and other agencies' investigative interests in law enforcement efforts to preserve national security.

Additionally, DHS needs these exemptions in order to protect information relating to background investigations from disclosure to subjects of investigations and others who could interfere with investigatory activities. Specifically, the exemptions are required to: withhold information to the extent it identifies witnesses promised confidentiality as a condition of providing information during the course of the background investigation; prevent subjects of investigations from frustrating the investigative process; avoid disclosure of investigative techniques; protect the privacy of third parties; ensure DHS' and other federal agencies' ability to obtain information from third parties and other sources; and safeguard sensitive information.

The exemptions proposed here are standard law enforcement and national security exemptions exercised by a large number of federal law enforcement and intelligence agencies.

Nonetheless, DHS will examine each separate request on a case-by-case basis, and, after conferring with the appropriate component or agency, may waive applicable exemptions in appropriate circumstances and where it would not appear to interfere with or adversely affect the law enforcement or national security purposes of the systems from which the information is recompiled or in which it is contained.

Again, DHS shall not assert any exemption with respect to information submitted by and collected from the individual or the individual's representative in the course of any redress process associated with the underlying System of Records.

**Regulatory Requirements**

*A. Regulatory Impact Analyses*

Changes to Federal regulations must undergo several analyses. In conducting these analyses, DHS has determined:

1. Executive Order 12866 Assessment

This rule is not a significant regulatory action under Executive Order 12866, "Regulatory Planning and Review" (as amended). Accordingly, this rule has not been reviewed by the Office of Management and Budget (OMB). Nevertheless, DHS has reviewed this rulemaking, and concluded that there will not be any significant economic impact.

2. Regulatory Flexibility Act Assessment

Pursuant to section 605 of the Regulatory Flexibility Act (RFA), 5 U.S.C. 605(b), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996 (SBREFA), DHS certifies that this rule will not have a significant impact on a substantial number of small entities. The rule would impose no duties or obligations on small entities. Further, the exemptions to the Privacy Act apply to individuals, and individuals are not covered entities under the RFA.

3. International Trade Impact Assessment

This rulemaking will not constitute a barrier to international trade. The exemptions relate to criminal investigations and agency documentation and, therefore, do not create any new costs or barriers to trade.

4. Unfunded Mandates Assessment

Title II of the Unfunded Mandates Reform Act of 1995 (UMRA), (Pub. L. 104–4, 109 Stat. 48), requires Federal agencies to assess the effects of certain regulatory actions on State, local, and tribal governments, and the private sector. This rulemaking will not impose an unfunded mandate on State, local, or tribal governments, or on the private sector.

*B. Paperwork Reduction Act*

The Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3501 *et seq.*) requires that DHS consider the impact of paperwork and other information collection burdens imposed on the public and, under the provisions of PRA section 3507(d), obtain approval from the Office of Management and Budget (OMB) for each collection of information it conducts, sponsors, or requires through regulations. DHS has determined that there are no current or new information collection requirements associated with this rule.

*C. Executive Order 13132, Federalism*

This action will not have a substantial direct effect on the States, on the relationship between the national Government and the States, or on the distribution of power and responsibilities among the various levels of government, and therefore will not have federalism implications.

*D. Environmental Analysis*

DHS has reviewed this action for purposes of the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. 4321–4347) and has determined that this action will not have a significant effect on the human environment.

*E. Energy Impact*

The energy impact of this action has been assessed in accordance with the Energy Policy and Conservation Act (EPCA) Public Law 94–163, as amended (42 U.S.C. 6362). This rulemaking is not a major regulatory action under the provisions of the EPCA.

**List of Subjects in 6 CFR Part 5**

Sensitive information, Privacy, Freedom of information.

For the reasons stated in the preamble, DHS proposes to amend Chapter I of Title 6, Code of Federal Regulations, as follows:

**PART 5—DISCLOSURE OF RECORDS AND INFORMATION**

1. The authority citation for Part 5 continues to read as follows:

**Authority:** Pub. L. 107–296, 116 Stat. 2135, 6 U.S.C. 101 *et seq.*; 5 U.S.C. 301. Subpart A also issued under 5 U.S.C. 552.

2. At the end of Appendix C to Part 5, add the following new paragraph:

**Appendix C to Part 5—DHS Systems of Records Exempt From the Privacy Act**

\* \* \* \* \*

3. DHS–ALL–005, Redress and Response Records System. A portion of the following system of records is exempt from 5 U.S.C. 552a(c)(3) and (4); (d)(1), (2), (3), and (4); (e)(1), (2), (3), (4)(G) through (I), (5), and (8); (f), and (g); however, these exemptions apply only to the extent that information in this system records is recompiled or is created from information contained in other systems of records subject to such exemptions

pursuant to 5 U.S.C. 552a(j)(2), (k)(1), (k)(2), and (k)(5). *Further, no exemption shall be asserted with respect to information submitted by and collected from the individual or the individual's representative in the course of any redress process associated with this system of records.* After conferring with the appropriate component or agency, DHS may waive applicable exemptions in appropriate circumstances and where it would not appear to interfere with or adversely affect the law enforcement or national security purposes of the systems from which the information is recompiled or in which it is contained. *Exemptions from the above particular subsections are justified, on a case-by-case basis to be determined at the time a request is made, when information in this system records is recompiled or is created from information contained in other systems of records subject to exemptions for the following reasons:*

(a) From subsection (c)(3) because making available to a record subject the accounting of disclosures from records concerning him or her would specifically reveal any investigative interest in the individual. Revealing this information could reasonably be expected to compromise ongoing efforts to investigate a known or suspected terrorist by notifying the record subject that he or she is under investigation. This information could also permit the record subject to take measures to impede the investigation, e.g., destroy evidence, intimidate potential witnesses, or flee the area to avoid or impede the investigation.

(b) From subsection (c)(4) because portions of this system are exempt from the access and amendment provisions of subsection (d).

(c) From subsections (d)(1), (2), (3), and (4) because these provisions concern individual access to and amendment of certain records contained in this system, including law enforcement counterterrorism, investigatory and intelligence records. Compliance with these provisions could alert the subject of an investigation of the fact and nature of the investigation, and/or the investigative interest of intelligence or law enforcement agencies; compromise sensitive information related to national security; interfere with the overall law enforcement process by leading to the destruction of evidence, improper influencing of witnesses, fabrication of testimony, and/or flight of the subject; could identify a confidential source or disclose information which would constitute an unwarranted invasion of another's personal privacy; reveal a sensitive investigative or intelligence technique; or constitute a potential danger to the health or safety of law enforcement personnel, confidential informants, and witnesses. Amendment of these records would interfere with ongoing counterterrorism, law enforcement, or intelligence investigations and analysis activities and impose an impossible administrative burden by requiring investigations, analyses, and reports to be continuously reinvestigated and revised.

(d) From subsection (e)(1) because it is not always possible for DHS or other agencies to know in advance what information is relevant and necessary for it to complete an identity comparison between the individual seeking redress and a known or suspected terrorist. Also, because DHS and other agencies may not always know what information about an encounter with a known or suspected terrorist will be relevant to law enforcement for the purpose of conducting an operational response.

(e) From subsection (e)(2) because application of this provision could present a serious impediment to counterterrorism, law enforcement, or intelligence efforts in that it would put the subject of an investigation, study or analysis on notice of that fact, thereby permitting the subject to engage in conduct designed to frustrate or impede that activity. The nature of counterterrorism, law enforcement, or intelligence investigations is such that vital information about an individual frequently can be obtained only from other persons who are familiar with such individual and his/her activities. In such investigations it is not feasible to rely upon information furnished by the individual concerning his own activities.

(f) From subsection (e)(3), to the extent that this subsection is interpreted to require DHS to provide notice to an individual if DHS or another agency receives or collects information about that individual during an investigation or from a third party. Should the subsection be so interpreted, exemption from this provision is necessary to avoid impeding counterterrorism, law enforcement, or intelligence efforts by putting the subject of an investigation, study or analysis on notice of that fact, thereby permitting the subject to engage in conduct intended to frustrate or impede that activity.

(g) From subsections (e)(4)(G), (H) and (I) (Agency Requirements) because portions of this system are exempt from the access and amendment provisions of subsection (d).

(h) From subsection (e)(5) because many of the records in this system coming from other system of records are derived from other domestic and foreign agency record systems and therefore it is not possible for DHS to vouch for their compliance with this provision, however, the DHS has implemented internal quality assurance procedures to ensure that data used in the redress process is as thorough, accurate, and current as possible. In addition, in the collection of information for law enforcement, counterterrorism, and intelligence purposes, it is impossible to determine in advance what information is accurate, relevant, timely, and complete. With the passage of time, seemingly irrelevant or untimely information may acquire new significance as further investigation brings new details to light. The restrictions imposed by (e)(5) would limit the ability of those agencies' trained investigators and intelligence analysts to exercise their judgment in conducting investigations and impede the development of intelligence necessary for effective law enforcement and counterterrorism efforts. The DHS has, however, implemented internal quality assurance procedures to ensure that the data used in the redress process is as thorough, accurate, and current as possible.

(i) From subsection (e)(8) because to require individual notice of disclosure of information due to compulsory legal process would pose an impossible administrative burden on DHS and other agencies and could alert the subjects of counterterrorism, law enforcement, or intelligence investigations to the fact of those investigations when not previously known.

(j) From subsection (f) (Agency Rules) because portions of this system are exempt from the access and amendment provisions of subsection (d).

(k) From subsection (g) to the extent that the system is exempt from other specific subsections of the Privacy Act.

Dated: January 12, 2007.

**Hugo Teufel III,**

*Chief Privacy Officer.*

[FR Doc. 07–191 Filed 1–12–07; 3:38 pm]

**BILLING CODE 4410–10–P**

---

# DEPARTMENT OF AGRICULTURE

## Agricultural Marketing Service

## 7 CFR Part 1260

**[No. LS–07–03]**

## Cattlemen's Beef Promotion and Research Program; Section 610 Review

**AGENCY:** Agricultural Marketing Service, USDA.

**ACTION:** Notice of review and request for comments.

---

**SUMMARY:** This action announces the Agricultural Marketing Service's (AMS) review of the Cattlemen's Beef Promotion and Research Program, which is conducted under the Beef Promotion and Research Order (Order), under the criteria contained in section 610 of the Regulatory Flexibility Act (RFA).

**DATES:** Written comments on this notice must be received by March 19, 2007.

**ADDRESSES:** Interested persons are invited to submit written comments concerning this notice of review. Comments must be sent to Kenneth R. Payne, Chief, Marketing Programs, Livestock and Seed Program, AMS, USDA, Room 2628–S, STOP 0251, 1400 Independence Avenue, SW., Washington, DC 20250–0251; Fax: (202) 720–1125; via e-mail at *beefcomments@usda.gov* or online at *www.regulations.gov.* All comments should reference the docket number, the date, and the page number of this issue of the **Federal Register**. Comments will be available for public inspection via the Internet at *http://www.ams.usda.gov/lsg/mpb/rp-beef.htm* or during regular business hours.

**FOR FURTHER INFORMATION CONTACT:** Kenneth R. Payne, Chief, Marketing Programs Branch, Livestock and Seed