## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1988 (ESH) |
| ) | |
| **DEPARTMENT OF HOMELAND** ) | |
| **SECURITY** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### DEFENDANT'S MOTION TO AMEND THE COURT'S APRIL 27, 2007 SCHEDULING ORDER AND FOR A STAY OF PROCEEDINGS

Defendant Department of Homeland Security respectfully moves this Court, pursuant to this Court's inherent authority and Section 552(a)(6)(C)(i) of the FOIA, 5 U.S.C. § 552(a)(6)(C)(i), to amend the Scheduling Order of April 27, 2007, which set the production and briefing schedule for this Freedom of Information Act ("FOIA") action, and for a stay of proceedings. As set forth in detail in the attached memorandum, due to unanticipated circumstances that have arisen subsequent to the Court's entry of the Scheduling Order, including the possible classification of a substantial portion of the records responsive to plaintiff's request, defendant is unable to complete production of all non-exempt, responsive records by November 1, 2007, the date set by the Scheduling Order. Accordingly, defendant seeks an extension of the November 1, 2007 deadline until April 30, 2008, for all records that are not subject to possible classification. Defendant will continue to produce responsive, non-exempt records not subject to possible classification on a bi-weekly basis until the production of these records is complete. In addition, because the decision whether to classify a substantial portion of potentially responsive records has not yet been made, defendant is not yet able to

determine when it will be able to produce those records.  Accordingly, defendant asks this Court

to stay production of those records pending a decision on possible classification, at which point

defendant will inform the Court and the plaintiff of the decision regarding these documents.

Finally, because the dates for submission of a *Vaughn* index and motions for summary judgment

are premised upon the production of all non-exempt, responsive records by November 1, 2007,

defendant likewise asks that the submission of a *Vaughn* index and cross-motions for summary

judgment be stayed until processing of plaintiff's request is complete.  A proposed order is

submitted herewith.

Pursuant to Local Rule 7(m), defendant's counsel telephoned plaintiff's counsel on

Wednesday, October 17, 2007, to discuss defendant's motion.  Plaintiff's counsel indicated that

plaintiff would oppose this motion.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td>Dated: October 18, 2007</td><td>PETER D. KEISLER<br>Assistant Attorney General</td></tr>
<tr><td></td><td>JEFFREY A. TAYLOR<br>United States Attorney</td></tr>
<tr><td></td><td>ARTHUR R. GOLDBERG<br>(D.C. Bar 180661)<br>Assistant Branch Director<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch</td></tr>
<tr><td></td><td>  <i>/s/ John R. Coleman</i>              <br>JOHN R. COLEMAN<br>Trial Attorney<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br><u>Mailing Address</u><br>P.O. Box 883<br>Washington, D.C., 20044</td></tr>
</table>

- 2 -

Delivery Address
20 Massachusetts Avenue, NW, Room 6118
Washington, D.C. 20530
Telephone: (202) 514-4505
Facsimile: (202) 616-8187
john.coleman3@usdoj.gov

Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ELECTRONIC FRONTIER FOUNDATION** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-1988 (ESH) |
| | ) | |
| **DEPARTMENT OF HOMELAND** | ) | |
| **SECURITY** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION TO AMEND THE
COURT'S APRIL 27, 2007 SCHEDULING ORDER AND FOR A STAY OF
PROCEEDINGS**

**INTRODUCTION**

This case involves plaintiff's Freedom of Information Act ("FOIA") request for

Department of Homeland Security ("DHS") records created after May 30, 2006, concerning the

negotiation and implementation of agreements between the United States and the European

Union ("EU") on the sharing of Passenger Name Record ("PNR") data for passengers traveling

between the United States and the member countries of the EU.  Following the denial of

plaintiff's motion for partial summary judgment regarding its entitlement to expedited processing

of its request, the Court ordered the parties to appear at a status conference on April 27, 2007.

At the status conference, defendant proposed that it begin producing non-exempt, responsive

records by June 1, 2007, and produce documents every two weeks thereafter on a rolling base

until November 1, 2007, when defendant expected it would complete processing of plaintiff's

FOIA request.  By Minute Order entered the same day, the Court adopted this production

schedule as well as a schedule for the submission of a *Vaughn* index and the parties' cross-motions for summary judgment ("Scheduling Order").

The production schedule proposed by defendant and subsequently ordered by the Court was based on defendant's belief that the processing of plaintiff's FOIA request would proceed from that point onward in a more or less routine fashion.  Subsequent to the entry of the Scheduling Order, however, defendant has encountered unanticipated delays in the processing of plaintiff's request, including delays in retrieving and processing potentially responsive records, and delays caused by the possibility that a large portion of the responsive records will be classified pursuant to Section 1.7(d) of Exec. Order 12,958, as amended, and therefore withheld from release pursuant to Exemption 1 of the FOIA, 5 U.S.C. § 552(b)(1).  The proposal to classify a large portion of the responsive records was formally submitted to the Secretary of DHS on October 12, 2007, and is currently awaiting his decision.  Accordingly, defendant asks this Court to extend the deadline for production of records that are not subject to possible classification until April 30, 2008, and to stay production of those records that may be classified until their classification status is resolved, at which point defendant will be better able to predict how long processing of these records will take.

## BACKGROUND

### A.    The Processing of FOIA Requests and the Department of Homeland Security

The Declaration of Vania T. Lockett describes the procedures adopted by DHS for the orderly and efficient processing of FOIA requests.  *See* Declaration of Vania T. Lockett, attached hereto as Exhibit A ("Lockett Decl."); *see also* 6 C.F.R. §§ 5.1-5.12.  Ms. Lockett is the Associate Director, Disclosure and Freedom of Information Act (FOIA) Operations within the

Departmental Disclosure Office of DHS.  Lockett Decl. ¶ 1.

DHS is comprised of the Office of the Secretary and 28 separate components dispersed in 80 buildings in over 50 locations throughout the Washington, D.C. metropolitan area.  *Id.* at ¶¶ 4, 21.  FOIA requesters are instructed to direct requests for documents to the component that maintains the records being requested.  *Id.* at ¶ 6.  If the requester is unsure which components maintain the requested records, the request should be sent to the Departmental Disclosure Office, which will forward the FOIA request to the components it believes are most likely to have responsive records.  *Id.*  The Departmental Disclosure Office handles FOIA requests received by the Office of the Secretary and the following DHS Components: the Executive Secretariat, the Office of the Undersecretary for Management, the Office of Policy, the Office of Legislative and Intergovernmental Affairs, the Office of Public Affairs, the Office of Counternarcotics Enforcement, the Ombudsman for Citizenship & Immigration Services, the Office of the Chief Privacy Officer, the Domestic Nuclear Detection Office, and the Federal Coordinator for Recovery and Rebuilding of the Gulf Coast Region.  *Id.* at ¶ 4.  Other Components of DHS, such as the Transportation and Security Administration ("TSA"), U.S. Customs and Border Protection ("CBP"), and United States Immigration and Customs Enforcement ("ICE"), have independent responsibility for processing FOIA requests for records they maintain.  *Id.*  If a FOIA request is unusually large, complex or important, the Departmental Disclosure Office may coordinate an agency-wide response to ensure uniform judgments regarding the scope of the request and appropriate exemptions.  *Id.* at ¶ 6.

In general, DHS processes FOIA requests in the order they are received.  *See* Lockett Decl. ¶ 5; 6 C.F.R. § 5.5.  In addition, DHS employs two tracks for processing FOIA requests, a

simple track for easily handled FOIA requests, and a complex track for large, time-consuming

FOIA requests. Lockett Decl. ¶ 5. A complex case handled by the Departmental Disclosure

Office may require consultation with the staff of the originating components, which given the

multitude of different office locations, may delay processing. *Id.* at ¶ 8, 21. In addition, if the

request is the subject of litigation, the Departmental Disclosure Office will also coordinate with

the Office of the General Counsel before releasing responsive, non-exempt records. *Id.* at *¶* 8.

When a FOIA request is received by the Department Disclosure Office, it first determines

which components are likely to have responsive documents. *Id.* at ¶ 6. If a FOIA request seeks

records from components with independent FOIA processing staff, the FOIA request is referred

to those components for processing, and the the Departmental Disclosure Office has no further

responsibility with respect to that FOIA request. *Id.* If a FOIA request is received for records

possessed by components the Department Disclosure Office services, the Departmental

Disclosure Office will retain ultimate responsibility for processing responsive records and

responding to the FOIA requester. *Id.* Even in these situations, however, the Departmental

Disclosure Office depends on the staff of individual components to search their files for

potentially responsive documents and to provide their views on potential exemptions. *Id.* at ¶ 7;

*see also* Referral Memos (Att. B, C to Lockett Decl.). Likewise, even when the Departmental

Disclosure Office has decided to coordinate the overall response to the request, it still depends

on the staff of the various components to search their files for responsive records and to assist

the Departmental Disclosure Office in identifying potential exemptions. *Id.* at ¶ 7. In some

cases, staff of the various components are unable to promptly comply with requests to search for

responsive records because of the demands of core agency business. *Id.* For example, the staff

of the Federal Emergency Management Agency (FEMA) was unable to respond to FOIA

requests in the aftermath of Hurricane Katrina. *Id.*

> **B.      The Processing of Plaintiff's FOIA Request Prior to the April 27, 2007 Status Conference**

Plaintiff's FOIA request concerns records relating to the negotiation and implementation

of a number of agreements between the United States and the EU concerning the transfer of

certain PNR data to DHS from air carrier reservation systems located within the EU.[1]  Plaintiff's

FOIA request was received on October 20, 2006 and sought the following agency records

created after May 30, 2006**:**

> 1.      emails, letters, reports, or other correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the U.S. for prescreening purposes;
>
> 2.      emails, letters, statements, memoranda, or other correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the Undertakings;
>
> 3.      records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used, disclosed to other entities, or combined with information from other sources; and
>
> 4.      complaints received from EU citizens or official entities concerning DHS acquisitions, maintenance and use of passenger data of EU citizens.

*See* Lockett Decl. ¶ 9, Att. A.  Plaintiff also requested expedited treatment of its request, as well

---

[1]The legal and factual background to the years-long negotiations between the United States and the EU on the sharing of PNR data is set forth in detail in defendant's Memorandum in Support of its Motion for Partial Summary Judgment. *See* Defendant's Memorandum in Support of its Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion for Partial Summary Judgment at 6-8 (Docket #13, Feb. 22, 2007).  Because the PNR agreement formally concluded on October 19, 2006 (hereinafter "Interim Agreement") was set to expire on July 31, 2007, the United States and the EU negotiated and concluded a final agreement (hereinafter "Final Agreement") on the sharing of PNR data on July 26, 2007.  *See* Declaration of Paul Rosenzweig, attached as Exhibit B (hereinafter "Rosenzweig Decl.") at ¶¶ 8, 10.

treatment as a member of the news media for fee purposes. *Id.* DHS denied plaintiff's request for expedited treatment, Lockett Decl. ¶ 11, 14, a decision upheld by this Court in its April 1, 2007 Memorandum Opinion. EFF's request for treatment as a member of the news media for fee purposes was ultimately granted. *Id.* at ¶ 14.

After receiving plaintiff's FOIA request, the DHS Departmental Disclosure Office referred it to several DHS components likely to have responsive records. *Id.* at ¶ 10. Those components with independent FOIA staff, specifically CBP, the Office of the General Counsel, and TSA, were asked to respond directly to plaintiff. *Id.* at ¶ 10, Att. B, C. Those components serviced by the Departmental Disclosure Office, including the Office of the Executive Secretariat, the Office of Policy, and the Office of the Chief Privacy Officer, were asked to search for responsive records and provide the records and any withholding recommendations to the Departmental Disclosure Office. *Id.* In late November 2006, in response to this lawsuit and the size and complexity of plaintiff's FOIA request, the Departmental Disclosure Office decided to assume responsibility for coordinating an agency-wide response. *Id.* at ¶ 13. Thereafter, the Departmental Disclosure Office referred plaintiff's FOIA request to four additional components: the Office of Inspector General, the Office of Operations Coordination, the Office of Intelligence and Analysis, and ICE, seeking any responsive records as well as the components' views with respect to any withholdings. *Id.* at ¶ 10, Att. D.

Initial responses from the components identified approximately 3,100 potentially responsive document pages contained in the files of the Office of the Chief Privacy Officer, the

Executive Secretariat, TSA[2] and CBP. *Id.* at ¶ 15. The Departmental Disclosure Office was aware, however, that this figure did not account for a large number of potentially responsive records, which were within the files of those individuals within the Office of Policy who had been primarily responsible for the negotiation of the Interim Agreement. *Id.* By April 2007, the Departmental Disclosure Office believed it had identified all, or nearly all, of the potentially responsive pages within DHS. *Id.* at ¶ 17. In addition, to those documents initially identified, the Departmental Disclosure Office was aware that a large number of documents were within the files of five individuals who had been heavily involved in the negotiation of the Interim Agreement: the Assistant Secretary for Policy, the Counselor to the Assistant Secretary for Policy, the Deputy Director for European & Multilateral Affairs within the Office of Policy, an individual attorney in CBP, and an individual attorney in the Office of the General Counsel. *Id.*

Although these individuals were aware of plaintiff's FOIA request, because they were heavily involved with the negotiation of the Final Agreement, they were unable to devote their immediate attention to retrieving responsive records from their files. *Id.* To assist some of these individuals in their search for responsive records, the Associate General Counsel for General Law sought assistance from the Office of Chief Counsel at TSA, which TSA agreed to provide. *Id.* at ¶ 18. With this assistance, the search for responsive records within the Office of Policy was expected to take approximately two weeks. *Id.* Based on these developments, the Departmental Disclosure Office informed the Court, through counsel, that it believed it could begin producing responsive, non-exempt records on June 1, 2007, continue producing such

---

[2]TSA had originally indicated that it possessed 600 potentially responsive pages, but most of these documents were ultimately determined not to be responsive. Lockett Decl. ¶ 15.

records on a bi-weekly basis, and complete production of all responsive, non-exempt records by November 1, 2007. *Id.* at ¶ 19. The Court's Scheduling Order adopted this production schedule and set a corresponding schedule for defendant's submission of a *Vaughn* index and the parties' submission of summary judgment motions.

### C. Subsequent Events Necessitating Additional Processing Time

Due to several unanticipated events that have occurred subsequent to the Court's entry of the Scheduling Order on April 27, 2007, defendant will not be able to complete processing of plaintiff's FOIA request by November 1, 2007. Lockett Decl. ¶ 26.

#### 1. The Pending Decision Regarding Classification of Responsive Documents

The most significant development since entry of the Scheduling Order is the determination by those officials within the Office of Policy primarily responsible for negotiating the Interim and Final Agreements that a great portion of the potentially responsive records should be classified and withheld from release in the interest of national security. *See* Lockett Decl. ¶ 25; Rosenzweig Decl. ¶¶ 6, 7, 12. Officials within the Office of Policy did not raise the possibility that they would seek classification of a great number of documents relating to the negotiation of the Interim and Final Agreements until the latter part of May, 2007, a month after defendant had proposed the November 1, 2007 deadline. *See* Lockett Decl. ¶ 25; Rosenzweig Decl. ¶ 9. Prior to May, these officials believed that records relating to their negotiations would be exempt from disclosure solely on the basis of the negotiating parties' mutual understanding that their negotiations would be conducted confidentially, and did not realize that these documents would have to be classified in order to be withheld. Rosenzweig Decl. ¶ 9.

By the time officials within the Office of Policy learned of the need to classify the

documents in order to give effect to the parties' mutual understanding, they were in the midst of detailed and sometimes contentious negotiations over the Final Agreement. *Id.* at ¶ 10. Although defendant realized that it would have to formalize the mutual understanding regarding the confidentiality of the negotiations before it could formally classify the documents relating to the parties' negotiations, defendant did not wish to jeopardize or complicate the negotiations by introducing this ancillary issue. *Id.* at ¶¶ 9, 10. As soon as the negotiations were complete, and the Final Agreement concluded, however, Deputy Assistant Secretary Rosenzweig sent a letter to the EU seeking to formally confirm the negotiating parties' mutual understanding regarding the confidentiality of records relating to the negotiations. *Id.* at ¶ 10, Att. A. Because confirmation of this understanding required formal approval by the European Council, which was in recess during all of August and part of September, the EU did not formally confirm the understanding regarding the confidentiality of the negotiating documents until October 2, 2007. *See Id.* at ¶ 11, Att. B, Att. C.

Once the EU had notified defendant that "[t]he European Union shares your understanding regarding the confidentiality of the negotiation process," *Id.* at ¶ 11, Att. C, Deputy Assistant Secretary Rosenzweig formally recommended to the Secretary of the Department of Homeland Security, Michael Chertoff, that he direct classification of documents concerning the negotiations. *Id.* at ¶ 12. This request was made on Friday, October 12, 2007, and is currently pending in the Secretary's office. *Id.* The basis of this request is that the negotiating documents contain both "foreign government information," which in this case would be the information shared by the negotiating parties with the expectation that it would remain confidential, and information relating to the "foreign relations or foreign activities of the United

States," which in this case would include "[m]aterial which discusses specific negotiating strategies, tactics or options, including information concerning the individuals engaged in the negotiations for the EU." *Id.* (citing Executive Order 12,958, as amended).

Due to the uncertainty over whether records responsive to plaintiff's request would be classified, and therefore exempt from release pursuant to Exemption 1 of the FOIA, defendant has been unable to process a significant portion of the responsive records. Lockett Decl. ¶ 25. Defendant will not be able to process these documents until the Secretary or Deputy Secretary of DHS decides whether to direct classification of these documents, and, if the direction to classify is issued, the documents are actually classified. *Id.* at ¶ 25, 32. Therefore, defendant will not be able to process potentially classified records responsive to plaintiff's FOIA request by November 1, 2007. *Id.* at ¶ 26, 34. Defendant anticipates that there will ultimately be over 2,000 pages of documents that will need to be reviewed for classification and, therefore, does not believe it will complete processing of these records until the latter part of 2008. *Id.* at ¶ 34.

    2.    *Other Unanticipated Delays in the Processing of Plaintiff's Request*

In addition to delays occasioned by the potential classification of responsive records, unexpected delays in receiving potentially responsive records from the Office of Policy has slowed processing of plaintiff's FOIA request. Lockett Decl. ¶ 20. Contrary to expectations, the Departmental Disclosure Office did not receive a set of responsive records from the Office of Policy to review for potential exemptions within weeks of the status conference because those officials whose files contained responsive records were unable to search their files due to the demands of negotiating the Final Agreement. *Id.*; Rosenzweig Decl. ¶ 8. The Office of Policy recognized the need for a FOIA processor of its own and attempted to hire one in June, but the

first candidate withdrew and the eventual selectee did not arrive until October 15, 2007.

Rosenzweig Decl. ¶ 5.  Because it lacked the resources to search its own files for responsive

records, the Office of Policy decided to download the entire contents of these individuals' hard

drives onto compact discs and asked members of the Office of the General Counsel, the

Departmental Disclosure Office, and the Office of the Chief Counsel of TSA to search the

contents for responsive records.  Lockett Decl. ¶ 20.

 The search for responsive records from among the files of the primary negotiators

required a tremendous effort on the part of officials within the Departmental Disclosure Office,

the Office of the General Counsel, and the Office of the Chief Counsel at TSA tasked with

processing plaintiff's FOIA request, and diverted this staff from the processing of other

identified responsive records.  Lockett Decl. ¶ 21.  For example, the Departmental Disclosure

Office has reviewed 7,400 pages of documents, most of which originated in the Office of Policy,

in order to identify 700 responsive pages.  *Id.*  This unanticipated search for responsive records

by FOIA processing staff, usually the job of individual staff members, has significantly slowed

the speed at which responsive documents can be processed.  *Id.* at ¶¶ 7, 21.

 Processing of responsive records has also been delayed by a number of other issues.  For

example, the Office of Chief Counsel at TSA encountered unanticipated technical difficulties in

retrieving two months of potentially responsive documents from the copy of Deputy Assistant

Secretary Rosenzweig's hard drive.  *Id.* at ¶ 23.  These records had been deleted due to a

computer crash and had to be retrieved from back-up tapes, delaying the processing of those

records.  *Id.*  Similarly, a week of missing emails from Assistant Secretary Baker's account had

to be retrieved by information technology technicians, also contributing to the delay.  *Id.* at ¶ 28.

Likewise, the need to coordinate processing of documents between officials in various offices in different locations often consumes time that would otherwise be spent reviewing documents for exemptions.  *Id.* at ¶ 21.  Finally, processing of plaintiff's FOIA request has been slowed by the need to process plaintiff's other FOIA request for records relating to the Automated Targeting System (ATS).  *Id.* at ¶ 22.  This request, which is the subject of a case briefly consolidated with this case, involves many of the same personnel, who are forced to divide their efforts in an attempt to comply with deadlines in both cases.  *Id.*

**D.    The Need For Additional Time**

For the reasons outlined above, defendant no longer believes it will be able to meet the November 1, 2007 deadline for the production of all responsive, non-exempt records.  *Id.* at ¶ 26. With the lone exception of the Office of Operations Coordination,[3] defendant has received responses to its requests to search for responsive records from every component within DHS believed to have responsive records.  *Id.* at ¶ 27.  Although defendant has processed over 700 document pages to date, it believes it has at least another 4,629 document pages left to review for responsiveness and possible classification, not including classified documents contained within the Office of Policy or the recently recovered week of emails from the account of the Assistant Secretary for Policy.  *Id.* at ¶¶ 27, 28.  In addition to these documents, defendant has already identified approximately 1,764 responsive document pages (some of which may be duplicates)

---

[3]Defendant has been unable to confirm that no responsive records exist in the Office of Operations because the FOIA processor for that office is on extended leave of indefinite duration.  In response to his absence, the Departmental Disclosure Office will soon assume responsibility for FOIA requests referred to the Office of Operations, including plaintiff's, and therefore will be able to confirm that the search for records responsive to plaintiff's request has been concluded.  *Id.* at ¶ 27.

that would likely be classified pursuant to the recommendation of the Office of Policy currently pending before the Secretary. *Id.* at ¶ 29. Defendant anticipates that it will ultimately identify over 2,000 pages that would be subject to classification. *Id.* at ¶ 34.

Currently, six individuals, drawn from the Departmental Disclosure Office, CBP, and the Office of the General Counsel, are assisting in the processing of plaintiff's FOIA request. *Id.* at ¶ 30. This figure does not include those officials within the Secretary's Office, the Office of the General Counsel, and the Office of Security involved in the decision of whether to direct classification of a portion of the responsive records. *Id.* at ¶¶ 30, 32 Defendant's plan for processing plaintiff's request begins with completing its segregation of those documents that may be classified from those that will not be classified. *Id.* at ¶ 30. Defendant believes it can complete this task by January 11, 2008. *Id.* In the meantime, defendant will continue to review and release those non-exempt records which clearly would not be classified at the Secretary's or Deputy Secretary's direction. *Id.* Given the time that must be diverted from processing records to reviewing for potential classification, the disruption to normal work that may result if classification is directed, the fact that the Departmental Disclosure Office may have to assume the FOIA work of the Office of Operations Coordination, and the likely loss of a FOIA processor from the Departmental Disclosure Office, defendant does not believe it can complete processing of those records that are not potentially subject to classification until April 30, 2008. *Id.* at ¶¶ 30, 34.

If the Secretary or Deputy Secretary directs the classification of records as requested by the Office of Policy, those records will have to be marked and treated appropriately. *Id.* at ¶ 32. Because the documents are located in several different places, and because the classification will

- 13 -

require the participation of the DHS Chief of Security, the time it will take to complete classification cannot yet be determined with certainty. *Id.* at ¶ 34. In addition, many of the documents identified as subject to possible classification likely contain sensitive law enforcement information or homeland security information, and will therefore have to be referred to CBP for a determination whether this information should be withheld pursuant to 5 U.S.C. § 552(b)(7)(e) or (b)(2). *Id.* at ¶ 33. Accordingly, defendant cannot predict when the processing of these records will be complete, but expects that it will be sometime in 2008. *Id.* at ¶ 34.

## DISCUSSION

### A.    Legal Standards

It is settled law that a federal "district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment." *United States v. LoRusso,* 695 F.2d 45, 53 (2d Cir. 1982); *see also Smith v. Massachusetts*, 543 U.S. 462, 475 (2005) (Ginsburg, J., dissenting) (quoting *LoRusso*). In this respect, a significant change in the factual circumstances upon which an interlocutory order is based is a valid ground for revisiting that order. *Cf. Nat'l Ctr for Mfg. Sci. v. Dep't of Def.*, 199 F.3d 507, 511 (D.C.Cir. 2000) (describing basis for granting a motion for reconsideration). Further, although the Scheduling Order at issue in this motion was not entered pursuant to Fed. R. Civ. P. 16(b),[4] this rule provides a useful standard for when a motion to amend a scheduling order should be granted: the movant's "showing of good cause." Fed. R. Civ. P. 16(b). In this respect, "good cause" to amend a

---

[4]The local rules specifically exempt FOIA actions from the coverage of Fed. R. Civ. P. 16(b). See LCvR 16.3(b)(9).

scheduling order exists if the deadlines therein "cannot reasonably be met despite the diligence of the party seeking the extension." Fed. R. Civ. P. 16 Advisory Committee Notes (1983 Amendment).

Defendant's request for additional time to complete processing of plaintiff's request is also consistent with the FOIA, which allows a district court to "retain jurisdiction and allow the agency additional time to complete its review of the records" when "the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. § 552(a)(6)(C)(i). Although motions for additional processing time pursuant to this provision most often arise "when an agency . . . is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, [and the agency's] existing resources are inadequate to deal with the volume of such requests within the [applicable] time limits . . . ." *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C.Cir. 1976), the statute "clearly contemplates that other circumstances . . . are relevant to the courts' determination as to whether exceptional circumstances exist." *Elec. Frontier Found. v. Dept. of Justice*, Case No. 06-cv-1708, 2007 WL 1334973, at *4 (D.D.C. May 7, 2007) (citing H.R.Rep. No. 104-795, at 24-25, 1996 U.S.C.C.A.N. 3448, 3468 (1996)).

The other circumstances that would justify granting an agency additional time to process a FOIA request include "an agency's efforts to reduce the number of pending requests, the amount of classified material, [and] the size and complexity of other requests processed by the agency." *Id.* In addition, the Court may consider a plaintiff's refusal to reduce the scope of a FOIA request as a factor in its determination. 5 U.S.C. § 552(a)(6)(C)(iii). In short, "'exceptional circumstances' include 'any delays encountered in responding to a request as long

- 15 -

as the agencies are making good-faith efforts and exercising due diligence. . . ."  *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 (D.D.C. 2005) (quoting *Appleton v. Food & Drug Admin.*, 254 F. Supp. 2d 6, 9 (D.D.C. 2003)); *see also Oglesby v. Dep't of the Army*, 920 F.2d 57, 64 (D.C. Cir. 1990) ("Frequently, if the agency is working diligently, but exceptional circumstances have prevented it from responding on time, the court will refrain from ruling on the request itself and allow the agency to complete its determination.").

      **B.**     **Due to Exceptional Circumstances, DHS Cannot Produce All Responsive, Non-Exempt Records to Plaintiff by November 1, 2007**

      The events subsequent to the April 27, 2007 status conference giving rise to this motion constitute both "good cause" for an amendment of the Scheduling Order as well as "exceptional circumstances" permitting extension of the production deadline for documents not subject to possible classification and a stay of the production deadline for those that documents that are subject to possible classification.  As described in the declarations of Vania Lockett, Associate Director, Disclosure and FOIA Operations for DHS, and Paul Rosenzweig, Deputy Assistant Secretary for Policy,[5] these "exceptional circumstances" include: a request from officials of the Office of Policy to classify large portion of the records responsive to plaintiff's FOIA request, unanticipated difficulties in retrieving potentially responsive documents from the Office of Policy, and the sheer complexity of processing a large FOIA request that implicates several different components of a dispersed agency.

---

     [5]When considering a request for additional time pursuant to 5 U.S.C. § 552(a)(6)(C), "[a]gency affidavits are accorded a presumption of good faith." *Safecard Servs., Inc. v. Secs. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C.Cir.1991).

1.    *The Possibility that Certain Responsive Records Will Be Classified Is An Exceptional Circumstance Necessitating Additional Time for Processing*

The FOIA requires agencies to comply with "any request for records," 5 U.S.C. § 552(a)(3), unless one of nine specific exemptions apply, 5 U.S.C. § 552(b). The first exemption – for information relating to the national security – is the result of Congress' recognition "that the disclosure of some information could be contrary to important national security interests." *Goldberg v. State*, 818 F.2d 71, 76 (D.C. Cir. 1987). It permits an agency to withhold information "specifically authorized under criteria established by an Executive order to be kept in secret in the interest of national defense or foreign policy" that is "in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

The current Executive Order setting forth the criteria for classification of national security information, referenced by Exemption 1, is Executive Order 12,958, "Classified National Security Information," as amended by Executive Order 13,292. *See* Classified National Security Information, Exec. Order 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (hereinafter "Classification Order"). The Classification Order "explicitly allows agencies to make classification and reclassification decisions in light of, and at the time of, FOIA requests." *Goldberg*, 818 F.2d at 77. It provides that:

> [i]nformation that has not previously been disclosed to the public under proper authority may be classified or reclassified after an agency has received a request for it under [the FOIA] only if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order.

Classification Order § 1.7(d). Likewise, DHS regulations implementing the Classification Order provide that such information may be "classified or reclassified only at the direction of the

- 17 -

Secretary or Deputy Secretary of Homeland Security." *See* 6 C.F.R. § 7.21(e). Exemptions

based on the classification of information after a FOIA request has been submitted for that

information have been upheld on numerous occasions. *See, e.g., Goldberg*, 818 F.2d 80-1

(upholding exemption based on classification of documents, some of which had been marked

"unclassified" prior to FOIA request); *Public Citizen v. Dep't of State*, 100 F. Supp. 2d 10, 23-25

(D.D.C. 2000) (Huvelle, J.) (upholding the withholding of responsive documents pursuant to

Exemption 1 that were classified after FOIA request was received), *aff'd in pertinent part*, 276

F.3d 634, 644-45 (D.C. Cir. 2002); *British Airports Auth. v. United States Dep't of State*, 530

F.Supp. 46, 48 (D.D.C.1981) ("While the documents were originally designated 'Limited

Official Use' and were only classified following plaintiff's FOIA requests, in view of changed

circumstances this delayed classification does not defeat the Department's (b)(1) claims.").

On Friday, October 12, 2007, officials within the Office of Policy formally recommended

that Secretary Chertoff direct classification of a significant portion of the records responsive to

plaintiff's FOIA request pursuant to section 1.7(d) of the Classification Order. Rosenzweig

Decl. ¶ 12. Specifically, these officials proposed classifying two categories of information: (1)

"foreign government information" consisting of correspondence relating to the negotiation of the

PNR agreements that was relayed with the expectation that it would be held in confidence,[6] and

internal deliberations or observations relating to the negotiations with the EU, the release of

which would adversely affect the "foreign relations or foreign activities of the United States."[7]

*Id.* If this information relating to the negotiation of the PNR agreements is ultimately classified,

---

[6]*See* Classification Order § 1.4(b).

[7]*See* Classification Order § 1.4(d).

- 18 -

it may be withheld pursuant to Exemption 1 of the FOIA. *See, e.g., Ctr. for Int'l Env't Law v. Office of the U.S. Trade Representative*, 237 F. Supp. 2d 17, 31-33 (D.D.C. 2002) (materials that would undermine U.S. negotiating position with foreign governments properly classified); *U.S. Comm. on Refugees v. Dep't of State*, Case No. 91-cv-3303, 1993 WL 364674, at *2 (D.D.C. Aug. 30, 1993) (holding that disclosure of "documents contain[ing] candid comments and frank assessments about the Haitian government and the roles of third countries in the Haitian refugee situation . . . reasonably could be expected to cause damage to the national security by jeopardizing the success of negotiations with Haiti on the migrant issue, and by damaging relations between the United States and other countries discussed in the documents."); *Fulbright & Jaworski v. Department of Treasury*, 545 F. Supp. 615, 619 (D.D.C.1982) (materials containing tax treaty "goals, rationales, and past experiences" properly classified because disclosure would undermine the United States' negotiating position); *British Airports Auth. v. United States Dep't of State*, 530 F. Supp. 46, 48 (D.D.C.1981) (materials containing "comments and strategy with respect to ongoing informal discussions with British officials" properly classified because disclosure would be likely to "impair the negotiating effectiveness of the United States and their relations with foreign officials").

Given the possibility that this information will be classified, defendant has neither processed nor released responsive records containing this information, nor can it do so until this decision is made. Lockett Decl. ¶ 25. Once this decision is made, defendant will be in a better position to estimate the time required to complete processing of plaintiff's request. Until then, the possibility that records responsive to plaintiff's FOIA request contain classified information is one of the "exceptional circumstances" explicitly contemplated by Congress when it amended

this provision with the Electronic FOIA amendments to allow agencies additional time for processing. *See* H.R.Rep. No. 104-795, at 24-25, 1996 U.S.C.C.A.N. 3448, 3468 (1996) ("Agencies may also make a showing of exceptional circumstances based on the amount of material classified . . . ."); *cf. The Nat'l Sec. Archive Fund, Inc. v. U.S. Dep't of Air Force*, Case No. 05-571, 2006 WL 1030152, at *5 (D.D.C. April 19, 2006) (recognizing that responsive documents must be reviewed to determine classification status before release of classified documents can be ordered). Accordingly, defendant asks this Court for additional time to determine whether to classify this information, and to process plaintiff's request in accord with the FOIA once this determination has been made.

2.    *Other Circumstances Warrant an Extension of Time for the Processing of Records That Will Not Be Classified*

In addition to the disruptions to the normal processing of plaintiff's FOIA request caused by the uncertainty over whether a large number of documents might be classified, defendant has encountered a number of other unanticipated problems that warrant extension of the November 1, 2007 deadline. Defendant did not anticipate that the officials within the Office of Policy likely to possess responsive records in their files would be unable to assist in the search for those files due to the demands of their positions, including the need to negotiate the Final Agreement on the sharing of PNR data. Lockett Decl. ¶¶ 20, 21; Rosenzweig Decl. ¶ 8. Defendant's FOIA processors have spent considerable time reviewing the entire content of these officials' hard drives to find responsive records, a task normally performed by the staff members within the components. Lockett Decl. ¶¶ 7, 21. Defendant has accomplished this task, finding 700 responsive document pages from among the 7,400 reviewed, but doing so diverted defendant's FOIA processing staff from their ordinary tasks of reviewing documents for exemptions. *Id.* at

¶ 21.  Likewise, the loss of data from Deputy Assistant Secretary Rosenzweig's hard drive for a critical two month period and a week's worth of missing emails from the account of Assistant Secretary Baker required defendant to obtain the potentially responsive records from back-up tapes, which also contributed to delays in processing plaintiff's FOIA request.  *Id.* at ¶¶ 23, 28. Finally, defendant has had to contend with the practical difficulties that accompany the need to coordinate processing of plaintiff's request among several different components located in various offices.  *Id.* at ¶ 21.

It is also worth noting that defendant's resources for processing plaintiff's FOIA request for records relating to the PNR agreements have been diverted by the need to process plaintiff's related FOIA request for records relating to the Automated Targeting System (ATS).  Lockett Decl. ¶ 22.  Defendant is trying to process both these requests expeditiously, but because they involve many of the same personnel, the practical reality is that processing both of these complex requests at the same time takes longer than processing either one alone.  *Id.*  The processing of multiple complex FOIA requests is another factor in favor of a finding of exceptional circumstances.  *See* H.R.Rep. No. 104-795, at 24, 1996 U.S.C.C.A.N. 3448, 3468 (1996) ("Agencies may also make a showing of exceptional circumstances based on . . . the size and complexity of other requests processed by the agency. . . .").  Finally, plaintiff's refusal to limit the scope of its request in response to defendant's proposal to exclude drafts from among those records that must be produced is another factor that must "be considered as a factor in determining whether exceptional circumstances exist."  5 U.S.C. § 552(a)(6)(C)(iii); *see* Declaration of John R. Coleman, attached as Exhibit C.  In short, the unanticipated complexities and difficulties defendant has encountered in the processing of plaintiff's FOIA request

constitute "exceptional circumstances," that warrant additional time.

      C.      **The Department of Homeland Security Is Exercising Diligence in the Processing of Plaintiff's FOIA Request**

      Defendant has demonstrated that it is diligently processing plaintiff's request. The Office of Policy has moved as quickly as reasonably possible in seeking classification of a portion of the requested records. Officials from within the Office of Policy sought to confirm with the EU the confidential nature of the negotiations that are the subject of plaintiff's FOIA request as early as the nature of the negotiations permitted. Rosenzweig Decl. ¶ 10. Due to the European Council's summer recess, the EU was unable to respond until early October, but defendant moved expeditiously thereafter to present its recommendation for classification to the Secretary. *Id.* at ¶¶ 11, 12. As a result, plaintiff's FOIA request is currently the subject of considerable attention at the very highest levels of DHS. *Id.* at ¶ 12. If the Secretary or Deputy Secretary determines to direct classification, the Office of Policy, alongside the DHS Office of Security and the Departmental Disclosure Office, has pledged to work expeditiously to classify these records, review them for other exemptions and produce non-exempt records to plaintiff. *Id.* at ¶ 13.

      Defendant has also demonstrated its commitment to the expeditious processing of plaintiff's request by adjusting its normal FOIA processing procedure and staffing to keep processing moving. For example, when it became clear that the Office of Policy needed assistance in processing plaintiff's FOIA request, the Associate General Counsel for General Law within the Office of the General Counsel, asked and received assistance from the Office of the Chief Counsel of TSA, a wholly separate component of DHS. Lockett Decl. ¶ 18. These TSA officials were still assisting the Departmental Disclosure Office in the processing of

plaintiff's request until very recently.  *Id.* at ¶ 28.  Likewise, when officials within the Office of

Policy were unable to search their own files for responsive records, Rosenzweig Decl. ¶ 8,

officials within the Departmental Disclosure Office, the Office of the General Counsel, and the

Office of the Chief Counsel of TSA stepped in to search through the Office of Policy's files for

responsive records, Lockett Decl. ¶ 21, notwithstanding the fact that it is not normally their job

to do so.  *Id.* at ¶ 7.  Further, the Office of Policy has addressed its inability to respond to FOIA

requests by recently hiring its first FOIA processor.  Rosenzweig Decl. ¶ 5.  In addition to

overcoming these staffing problems, defendant has overcome several technical obstacles to the

retrieval of potentially responsive records, further demonstrating its diligence in responding to

plaintiff's request.  *See* Lockett Decl. ¶¶ 23, 28.

       Defendant is committed to continuing to process plaintiff's FOIA request with diligence.

There are six individuals currently working on processing plaintiff's request, not including those

addressing the classification issue, or the recently departed staff of TSA's Office of the Chief

Counsel.  Lockett Decl. ¶ 30.  With the assistance of these individuals, defendant currently

believes that it can identify any records that may be subject to classification by January 30, 2008,

continue producing records not subject to classification on a bi-weekly basis, and complete

production of unclassified records by April 30, 2008.  *Id.*  If the Secretary or Deputy Secretary

decides to follow the Office of Policy's recommendation to classify responsive documents,

officials within the Office of Security and the Office of Policy will work expeditiously to

complete the classification so that the Departmental Disclosure Office and the individuals

currently assisting the Departmental Disclosure Office can complete processing of plaintiff's

request.  Rosenzweig Decl. ¶ 13.  Defendant will promptly notify the Court and plaintiff of that

decision, and will propose a plan for processing classified records as soon as practicable

thereafter.

## **CONCLUSION**

For all of the foregoing reasons, defendant respectfully requests that the Court grant its

motion to amend the Scheduling Order and for a stay of proceedings.


Dated: October 18, 2007                    PETER D. KEISLER
                                           Assistant Attorney General

                                           JEFFREY A. TAYLOR
                                           United States Attorney

                                           ARTHUR R. GOLDBERG
                                           (D.C. Bar 180661)
                                           Assistant Branch Director
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch


                                             _/s/ John R. Coleman_____
                                           JOHN R. COLEMAN
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           Mailing Address
                                           P.O. Box 883
                                           Washington, D.C., 20044
                                           Delivery Address
                                           20 Massachusetts Avenue, NW, Room 6118
                                           Washington, D.C. 20530
                                           Telephone: (202) 514-4505
                                           Facsimile: (202) 616-8187
                                           john.coleman3

                                           Counsel for Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:06CV01988 |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| HOMELAND SECURITY, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF VANIA T. LOCKETT

I, Vania T. Lockett, hereby declare and state as follows:

(1) I am the Associate Director, Disclosure and Freedom of Information Act

(FOIA) Operations within the Privacy Office, Department of Homeland Security (DHS),

Washington, D.C. 20528. I assumed this position in December 2006.

(2) Prior to joining the Federal Government, I worked for McNeil Technologies,

Inc. as a Project Manager and Senior FOIA Specialist in support of DHS from February

2006 through November 2006. Prior to supporting DHS, from June 1999 to February

2006, I provided FOIA and/or declassification support to the Department of

Transportation and to several Department of Defense agencies, including the Defense

Threat Reduction Agency, the Office of the Assistant Secretary of Defense for

International Security Policy, and the Office of the Secretary of Defense. My experience

includes the review of complex FOIA and Privacy Act requests and responsive records,

such as National Security Information (NSI), Restricted Data and Formerly Restricted

Data (RD/FRD), For Official Use Only (FOUO) information, proprietary business

information, and other sensitive or complex documents.

(3) My current duties at DHS involve management of day-to-day operations of the Headquarters Department of Homeland Security Freedom of Information Act (FOIA) program, to include processing of FOIA and Privacy Act (PA) requests made pursuant to 5 U.S.C. §552 and 5 U.S.C. §552a. Due to the nature of my official duties, I am familiar with DHS's obligations under the FOIA and PA, and the procedures followed by DHS in responding to requests. I make this declaration on personal knowledge and on information I have received in the performance of my official duties.

## DHS FOIA Processing

(4) DHS is currently comprised of the Office of the Secretary and some 28 separate Components. My office is responsible for processing FOIA/PA requests received by the Office of the Secretary and the following DHS Components: the Executive Secretariat, the Office of Policy, the Office of Legislative Affairs, the Office of Public Affairs, the Office of Counternarcotics Enforcement, the Ombudsman for Citizenship & Immigration Services, the Office of the Chief Privacy Officer, the Domestic Nuclear Detection Office, and the Federal Coordinator for Recovery and Rebuilding of the Gulf Coast Region. Other Components of DHS, such as the Transportation Security Administration (TSA), U.S. Customs and Border Protection (CBP), U.S. Immigration and Customs Enforcement (ICE), and the Office of the General Counsel, have independent responsibility for processing FOIA requests for records they maintain.

(5) Pursuant to DHS interim FOIA regulations, DHS processes FOIA requests in the order they are received. In addition, DHS and its Components use multi-track

2

processing, assigning a FOIA request to the simple or complex processing queue based on the amount of work and/or time needed to process the request, including limits based upon the number of pages involved.

(6) FOIA requesters are instructed to direct their requests to the Component[s] most likely to maintain the records they seek. If a FOIA requester is unsure which Components maintain the responsive records he may submit the request to my office, and my staff will make an initial determination of which Components are likely to have responsive documents. If we determine that a Component with independent FOIA staff is likely to have the responsive documents, we refer the request to the Component's FOIA officer who will process the request and respond directly to the requester. The request will then become part of the FOIA workload of that Component. If we determine that Components we service possess records responsive to the FOIA request, our office will be responsible for processing decisions, including the initiation of appropriate document searches and the line-by-line examination of responsive records. When a FOIA request implicates several Components, or is unusually complex or high-profile, my office may coordinate an agency-wide response. In such cases, my office will handle the processing for the Components we service and coordinate the response of those Components with independent FOIA staff.

(7) Once we determine which Components are likely to maintain records responsive to a FOIA request, my office will initiate a search by instructing the staff of those Components we service to search within their files for records that may be responsive and deliver any potentially responsive records, along with their views on potential exemptions, to our office for processing. My office does not have the

3

knowledge needed to search for records in Component offices, nor are we staffed to do so. Therefore, we must depend upon the Component staff to search for responsive records and provide those records to our office while still performing the duties of their positions. In some cases, the demands of other agency business prevent Component staff from promptly responding to our requests to search for records responsive to a FOIA request. For example, in the aftermath of Hurricane Katrina, the FEMA staff was too overwhelmed with work related to its response to conduct searches or otherwise respond to FOIA requests.

(8) Once we begin receiving potentially responsive records from Component staff, the staff within my office must confirm that the records are responsive and determine whether any responsive records or portions of responsive records are otherwise exempt from disclosure pursuant to the FOIA exemptions. In undertaking this inquiry, we may consult with the originating staff to better understand the nature of the records. In addition, when a FOIA request is the subject of litigation, we may consult with attorneys within the Office of the General Counsel when determining whether a given record is responsive or exempt.

### Initial Response to Plaintiff's October 20, 2006, FOIA Request

(9) By facsimile dated October 20, 2006, plaintiff Electronic Frontier Foundation ("EFF") submitted a FOIA request for records concerning the negotiation and implementation of an agreement between the United States and the European Union ("EU") on the sharing of Passenger Name Records ("PNR") for passengers traveling between the United States and the member countries of the EU. Specifically, plaintiff sought agency records created after May 30, 2006 within the following categories:

4

1.    emails, letters, reports, or other correspondence from DHS officials to
      European Union officials concerning the transfer and use of passenger
      data from air carriers to the US for prescreening purposes;

2.    emails, letters, statements, memoranda, or other correspondence from
      DHS officials to U.S. government officials or employees interpreting or
      providing guidance on how to interpret the Undertakings;

3.    records describing how passenger data transferred to the U.S. under the
      temporary agreement is to be retained, secured, used, disclosed to other
      entities, or combined with information from other sources; and

4.    complaints received from EU citizens or official entities concerning DHS
      acquisition, maintenance and use of passenger data of EU citizens.

EFF also requested expedited treatment of its request, a public interest fee waiver and

treatment as a member of the news media for fee purposes. (A copy of plaintiff's FOIA

request is appended to this declaration as Attachment A).

(10) Upon receipt of plaintiff's FOIA request, we reviewed its content and

determined that it likely involved documents retained by DHS personnel in multiple

Components. Anticipating that such a request would involve significant search time, as

well as frequent intra-agency consultations, a FOIA program specialist assigned the

request to the complex track for processing. At the time of the receipt of plaintiff's

request, 29 complex requests were in the FOIA queue ahead of this request. On

November 1, 2006, my office determined that CBP, the Office of the Executive

Secretariat, and the Office of Policy were likely to have documents responsive to the

request. We referred the request to those components, directing CBP to respond directly

to the requester, and directing the Office of the Executive Secretariat and the Office of

Policy to search for responsive records and deliver those records to the Privacy Office

along with their views on appropriate exemptions by November 15, 2006. (A copy of

these referral memorandums are appended to this Declaration as Attachment B.) Later,

5

after receiving further information, my office determined that TSA, the Office of the General Counsel, and the Office of the Chief Privacy Officer might have documents responsive to the request, and referred plaintiff's request to those Components, on November 22 and November 27, 2006, respectively. (A copy of these referral memorandums are appended to this Declaration as Attachment C). Still later, we determined there might be responsive documents in the Office of Inspector General, the Offices of Operations Coordination and Intelligence and Analysis, and United States Immigration and Customs Enforcement (ICE), and referrals were made to those Components on January 26, 2007, March 26, 2007, and July 23, 2007, respectively. (A copy of these referral memos/emails are appended to this Declaration as Attachment D).

(11) My office acknowledged receipt of the plaintiff's FOIA request by letter dated November 1, 2006. (Attachment E). The letter advised plaintiff that: (1) its request was assigned reference number DHS/OS/PRIV 07-90; (2) DHS was denying plaintiff's request for expedited treatment; (3) DHS was holding EFF's request for a fee waiver in abeyance pending the quantification of responsive records; and (4) in the event that the fee waiver was denied they would be charged as a non-commercial requestor.

(12) On November 21, 2006, plaintiff administratively appealed DHS's decision to deny "EFF's request to be treated as a 'news media' requester for purposes of fee assessments," and DHS's decision to deny plaintiff's "request for expedited processing of its FOIA request." (Attachment F). In addition, the letter stated that "EFF is notifying the agency that is does *not* agree to pay *any* fees related to search time." Consistent with DHS FOIA regulations, specifically 6 C.F.R. §5.3(c), in response to EFF's refusal to pay any fees, DHS halted searching for responsive records while plaintiff's appeal of the

denial of its request for news media status was pending.

(13) In late November 2006, shortly after we learned of this litigation, I was contacted by the DHS Office of the General Counsel concerning the processing of this FOIA request. At that point, I began to gather preliminary information concerning the size and complexity of plaintiff's FOIA request. Once we determined that this request was large and complex, involved many different components, and was the subject of litigation, we decided on November 28, 2006 that our office would coordinate the various Components' responses to the plaintiff's request. The decision to centralize processing in our office was intended to ensure that judgments about responsiveness or withholdings would be consistent among the various Components, but it did not relieve the various Components of their responsibility to search for potentially responsive records and deliver those records to my office.

(14) On or about December 7, 2006, DHS decided to grant media status to the plaintiff, and so advised the Components to renew their search for responsive documents. DHS informed the plaintiff of its decision to grant media status by letter dated December 15, 2006. (Attachment G) The same letter affirmed DHS's denial of the plaintiff's request for expedited processing.

(15) Following our decision to centralize the response to this FOIA request, we sought from each affected Component information regarding the progress of its search for records potentially responsive to plaintiff's request. By January 18, 2007, we had identified approximately 3,100 potentially responsive document pages within DHS. With respect to the Components we service, we had identified approximately 1,500 potentially responsive pages within the Office of the Chief Privacy Officer and the Office of the

7

Executive Secretariat. Although we were aware that the Office of Policy, whose officials were primarily responsible for negotiating with the EU, would have hundreds if not thousands of responsive documents, those officials had not actually collected potentially responsive records from their files. With respect to those Components with independent FOIA staff, we were informed as follows: CBP had identified various sub-Components within CBP likely to have responsive documents, only some of which had reported the results of their search. At that time, CBP had identified approximately 916 potentially responsive pages. TSA was reporting it had approximately 600 potentially responsive pages, although most of those documents were later determined not to be responsive. The Office of the General Counsel reported it had responsive documents, but had not yet begun to quantify those documents.

(16) Over the course of the next three months, we periodically requested from the affected Components any updates on their respective searches for potentially responsive documents. With the exception of the Office of Policy, which had reportedly identified 300 responsive pages, we did not learn of any additional responsive pages.

(17) By late April 2007, just prior to the status conference in this litigation, I believed we had identified – if not quantified – all or nearly all of the potentially responsive documents within DHS. In addition to those documents we had already identified, my office had learned from the Office of the General Counsel that certain members of the Office of Policy staff, who had primary responsibility for negotiating the agreement that is the subject of plaintiff's FOIA request, likely had a large number of responsive documents in their files, primarily in electronic format. These individuals included the Assistant Secretary for Policy, Stewart Baker, Counselor to the Assistant

8

Secretary for Policy, Paul Rosenzweig, and the Deputy Director for European &
Multilateral Affairs, Michael Scardaville. My office was informed by the Office of the
General Counsel that these individuals had been unable to respond to our earlier requests
for specific information because of their focus on the negotiation of a final agreement
respecting the sharing of PNR data between the U.S. and the EU. Likewise, our office
was aware that an individual lawyer within CBP and an individual lawyer within the
Office of the General Counsel had also been involved in the negotiations, and were likely
to have responsive documents. These individuals were also unable to fully review the
documents they had identified as potentially responsive because of their focus on the
ongoing negotiations with the EU.

(18) On April 26, 2007, in order to facilitate the search for documents responsive
to plaintiff's request, the Associate General Counsel for General Law asked the Office of
the Chief Counsel at the Transportation Security Administration (TSA) to assist
individuals within the Office of Policy in responding to plaintiff's FOIA request. TSA
agreed to assist the Office of Policy in conducting their search, which was expected to
take approximately two weeks.

(19) In light of these developments, DHS Counsel informed Department of
Justice (DOJ) counsel for the litigation that with the assistance of TSA counsel, DHS
believed it could respond to the plaintiff's FOIA request by November 1, 2007. DOJ
counsel then conveyed the November 1 date to the Court in a status conference on April
27, 2007.

### Events Subsequent to the Status Conference

(20) On April 27, 2007, the Office of Policy determined that the Assistant

9

Secretary, the Counselor to the Assistant Secretary for Policy, and the Deputy Director for European & Multilateral Affairs would not have time to search their computers for potentially responsive records while simultaneously conducting negotiations on the final agreement with the EU. Consequently, the Office of Policy asked DHS Information Technology to download the contents of these individuals' computers onto CDs/DVDs. The CDs/DVDs were then delivered to Office of the General Counsel in order to search for and find responsive records, and redact exempt material. Although we anticipated that the Office of Policy might produce a large number of responsive documents, we did not anticipate that attorneys within the Office of the General Counsel and TSA Office of Chief Counsel, as well as members of our staff, would have had to review virtually every email and document on the CDs/DVDs to locate potentially responsive documents.

(21) This unanticipated review has slowed our normal FOIA processing significantly by diverting the staff of my office as well as attorneys from the Office of Chief Counsel at TSA, and the Office of the General Counsel for DHS from processing responsive documents to attempting to identify responsive documents from the Office of Policy. For example, we have reviewed some 7,400 pages of documents (including some non-Policy documents), 6,700 of which we have determined are not responsive to the FOIA request. Moreover, since DHS is a new federal agency, it is currently housed in about 80 buildings on over 50 locations in the National Capital Area. My office is in Rosslyn, Virginia. The Office of Policy and the Office of the General Counsel are at a location in northwest Washington. TSA's Office of Chief Counsel is in Crystal City, Virginia. Consequently, coordinating the review and release of documents has been challenging, sometimes requiring physical travel from one location to another. At a

minimum, both counsel and my reviewers have lost precious review time because they often have to scan documents to send back and forth for review, redaction and release.

(22) The processing of this request by EFF has also been affected by the processing of another request by EFF for documents pertaining to the Automated Targeting System (ATS). Many of the same personnel within DHS are involved with responding to both requests, both of which are being litigated. For example, one attorney at CBP has numerous documents responsive to both requests. Additionally, CBP personnel in various offices are not only searching for documents on PNR and ATS, but also reviewing documents referred to them by our office, particularly documents which might contain sensitive law enforcement information. Likewise, because the Office of Policy has had equities in several documents, we have referred documents on ATS to that office. Again, this process is slowed either by cross-town mail time, or by the scanning and printing required when emailing documents for review.

(23) Additionally, the Office of Chief Counsel at TSA, while reviewing the CDs/DVDs from Policy determined that a large block of time was missing from the computer records of the Counselor. Upon inquiry, the Counselor indicated that his computer had crashed, and he lost data for approximately 2 months. However, we requested Information Technology check back-up tapes. That was accomplished, and DHS reviewed and retrieved any responsive documents from the data on tapes backing-up the Counselor's computer. Pulling the backup tapes also added to the processing time of this request.

(24) The Office of Policy also recently provided potentially responsive documents which are classified. DHS was not the classifier of those documents, so the

11

papers had to be retrieved to be referred to the entities which originally classified the material to determine whether or not it can be declassified or released. In order to refer this material, I had to physically go to northwest Washington, retrieve the material, and courier it back to our location.

(25) The most significant unanticipated development, however, is a recommendation from the Deputy Assistant Secretary for Policy to the Secretary to classify a significant number of responsive documents. We were not aware, at the time we indicated we could complete the processing of this FOIA request by November 1, 2007, that the Office of Policy believed that release of some of the responsive documents could harm the national security, or that the Office of Policy would seek to have these documents classified. In fact, I did not learn of the possibility that the Office of Policy would seek to have these documents classified until on or about May 30, 2007. In light of this possibility, we have not processed or released a large portion of the responsive documents that we believed might be classified. I understand that on October 12, 2007, officials within the Office of Policy formally requested that the Secretary classify a large portion of potentially responsive records. We cannot process these records until the classification status of these documents is determined.

(26) Because of this pending request to classify a large number of documents, the referral of documents already classified, and the large number of Policy documents we and counsel have had to review in the first instance, we will not be able to process plaintiff's FOIA request by November 1, 2007, as we anticipated in April.

**Expected Time Frame to Complete Processing Plaintiff's FOIA Request**

(27) To date, we have processed over 700 document pages that are responsive to

plaintiff's FOIA request. We have released any responsive, non-exempt records not among those that would be potentially classified on a bi-weekly basis since our first release on June 1, 2007. We have received a response from every Component or sub-Component believed to possibly have responsive records, except the Office of Operations Coordination. The FOIA processor for the Office of Operations is on extended leave, and will be unavailable for an indefinite period of time. Therefore, he has not responded to my requests to verify that the search in the Office of Operations has been concluded. I have contacted his supervisor to verify the search at Operations is concluded, but I am unable to verify that at this time. If the processor's absence lasts much longer, I anticipate my office will have to assist Operations with their FOIA workload and we would then have first-hand access to the search records to determine the search there has been concluded.

(28) As a result of our search within DHS we currently have pending approximately 4,629 pages to review for responsiveness and possible classification. My office currently has approximately 1,611 pages pending this review. TSA counsel just completed printing off another approximately 818 pages of documents which are potentially responsive, the vast majority of which they believe may be recommended for classification. Most of the documents TSA printed off came from the CDs/DVDs provided by the Office of Policy. In addition, Customs and Border Protection notes it has approximately 1,000 pages for review for responsiveness and possible classification, and the Office of the General Counsel, another 1,200. We are also still attempting to retrieve possibly responsive classified documents from the safes of the Assistant and Deputy Assistant Secretaries, and from their classified email accounts. And, counsel for TSA

13

identified a week of missing emails for Assistant Secretary Baker, which were just retrieved by Information Technology, after numerous requests. We will have to examine all of the Assistant Secretary's emails for that week to determine which documents might be responsive.

(29) With the caveat that there may be duplicate documents because numerous people often received the same emails, my office has identified another approximately 1,202 pages set aside for possible classification, and the Office of the General Counsel has another 562 responsive pages being held for possible classification. We have not yet been able to compare the General Counsel's 562 pages with our 1,202 pages to determine if there are duplicates since we are not co-located, but our combined offices have approximately 1,764 pages set aside for possible classification (this is in addition to, and not included in, the total above of 4,629 pages).

(30) Currently, 6 individuals are assisting in the processing of plaintiff's FOIA request: 2 from my office, 3 from CBP, and counsel from the Office of the General Counsel. Our first task is to complete review of the approximately 4,629 pages we have pending in DHS to determine whether or not any of the documents should be referred for possible classification. We believe we can accomplish this task by January 11, 2008. We would continue to review and release those documents which clearly do not meet any standards for classification, and would expect to complete release of all documents not referred for classification by April 30, 2008. This period of time accounts for the fact that I may be required to provide a FOIA processor for the Office of Operations Coordination, and that it appears one of my processors will also be on extended maternity leave in the near future.

14

(31) Likewise, the Office of Policy must review the classified documents it maintains, and determine if any responsive documents may be declassified at this time. The Office of Policy indicates they believe they can accomplish this by December 31, 2007.

(32) If the Secretary or Deputy Secretary grants the request to classify certain categories of documents, the Office of Policy and the DHS Office of Security will then need to review each document set aside for possible classification, line-by-line, to determine whether or not classification is appropriate. If so, those documents will need to be marked appropriately. Moreover, if there are paragraphs which are not classified, the documents must still be reviewed to determine if another FOIA exemption is appropriate, and thereafter redacted or withheld for release, as appropriate. The DHS Office of Security is located at L'Enfant Plaza, where virtually none of the documents reside. Once again, because of possible classification, either the documents will have to be hand-carried across town, or the "hands-on" classifier and the DHS Chief of Security (who is the final classification authority) will need to transit to the locations where the various documents reside (my office in Rosslyn, northwest Washington, and the Ronald Reagan Building in Washington, at a minimum).

(33) Our review of many of the documents being segregated for possible classification indicates that there may also be sensitive law enforcement information or homeland security information within the documents. Based upon our processing of this FOIA request, it is likely those documents will then have to be referred to CBP for a determination of whether certain information should be withheld under the law enforcement exemption (5 U.S.C. §552(b)(7)(e)), or as homeland security information (5

15

U.S.C. § 552(b)(2)—"high b2"). This will take additional processing time.

(34) In addition to review of these documents for release under the FOIA, the Office of Security must also, contemporaneous with this review, locate paper and electronic copies of these documents so those can also be classified, as appropriate, and search for and identify any documents within the realm of classification which are not specifically responsive to this FOIA request. We are aware that the computers in our office, which are not suitable for storage of classified material, contain copies of these documents. Consequently, we anticipate disruption to our office's normal business while the computers are "scrubbed" of classified material. Likewise, we've sent those same documents to agency counsel for this case, so we also anticipate disruption in the Office of the General Counsel. Since we anticipate there will be over 2,000 pages of documents which will need to be reviewed for classification, we believe this will be a lengthy process. Therefore, we do not believe the process of determining which documents are classified, and redacting the remaining portions of the documents which are not classified, will be completed until sometime in 2008.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 18th day of October, 2007.

VANIA T. LOCKETT

# Attachment A

*to the Declaration of Vania T. Lockett*

 **Electronic Frontier Foundation**

1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009
+1 202 797 9009 (tel)
+1 202 797 9066 (fax)

FAX COVER SHEET

R E C E I V E D
07-90
OCT 2 3 2006
**PRIVACY OFFICE**

DATE: 10/20/06

TO: HUGO TEUFEL, DHS

Fax Number: (571) 227-1125

FROM: MARCIA HOFMANN, EFF

RE: FOIA REQUEST + REQUEST FOR EXPEDITED PROCESSING

Pages sent: 7 including cover page

COMMENTS:

NOTICE This fax is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure. If you are not the intended recipient or his or her agent, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited and asked to please notify us immediately by telephone. Thank you.

PLEASE CALL IF THERE IS A PROBLEM



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

October 20, 2006

**BY FACSIMILE — (571) 227-1125**

Department of Homeland Security Chief FOIA Officer
Hugo Teufel
Chief FOIA Officer
The Privacy Office
Department of Homeland Security
Arlington, VA 22202

RE:  Freedom of Information Act Request and
       Request for Expedited Processing

Dear Mr. Teufel:

This letter constitutes an expedited request under the Freedom of Information Act ("FOIA"), 5
U.S.C. § 552, and is submitted to the Department of Homeland Security ("DHS") on behalf of
the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA
Litigation for Accountable Government ("FLAG") Project, which works to obtain government
documents and make them widely available to the public.

In 2004, the United States ("U.S.") and European Union ("EU") reached an agreement on the
processing and transfer of Passenger Name Record data to DHS concerning flights between the
US and EU.[1] Shortly thereafter, DHS issued the "Undertakings," a set of representations
reflecting how DHS (specifically, Customs and Border Protection) would handle the data.[2] The
European Court of Justice ruled the EU-U.S. agreement illegal under EU law in May 2006,
ordering that it would become void on September 30.[3] In light of the decision, the U.S. and EU
worked to renegotiate the terms of the agreement.

Earlier this month, the U.S. and EU reached a temporary agreement on the processing and
transfer of passenger data from airlines to DHS to replace the 2004 agreement.[4] At the same
time, DHS sent a letter to EU officials stating that it will interpret the 2004 Undertakings more
broadly to permit, among other things, more substantial disclosure of passenger data to other
U.S. agencies with counterterrorism functions.[5] Even with the new agreement in place, Reuters
reported, "[t]he United States will push for more flexible arrangements with Europe on how U.S.
agencies can use the personal records of air passengers to combat terrorism." Mark John, *U.S. to*

---

[1] This agreement is available at http://www.eur-lex.europa.eu/LexUriServ/site/en/oj/2004/l_183/
L_18320040520en00840085.pdf.

[2] The Undertakings are available at http://www.dhs.gov/interweb/assetlibrary/CBP-DHS_PNRUndertakings5-25-
04.pdf.

[3] The court's decision is available at http://curia.europa.eu/jurisp/cgi-bin/gettext.pl?where=&lang=en&num=
79939469C19040317&doc=T&ouvert=T&seance=ARRET.

[4] The new agreement is available at http://www.statewatch.org/news/2006/oct/eu-usa-pnr-coun-new-agreement.pdf.

[5] The letter is available at http://www.statewatch.org/news/2006/oct/eu-usa-pnr-letter-13738.pdf.

1875 Connecticut Ave., NW · Suite 650 · Washington, DC 20009
202 797 9009  202 797 9066  www.eff.org  information@eff.org

*Seek More Leeway on Air Passenger Records*, Reuters, Oct. 17, 2006. In the absence of further government action, the interim agreement will expire on July 31, 2007.

We are seeking the following agency records from May 30, 2006 to the present (including, but not limited to, electronic records):

1.  emails, letters, reports, or other correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the US for prescreening purposes;

2.  emails, letters, statements, memoranda, or other correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the Undertakings;

3.  records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used, disclosed to other entities, or combined with information from other sources; and

4.  complaints received from EU citizens or official entities concerning DHS acquisition, maintenance and use of passenger data of EU citizens.

**Request for Expedited Processing**

This request warrants expedited processing because it pertains to a matter about which there is an "urgency to inform the public about an actual or alleged federal government activity," and the request is made by "a person primarily engaged in disseminating information." 6 CFR § 5.5(d)(1)(ii).

The temporary agreement on transfer of passenger data expires on July 31, 2007, and will need to be renegotiated prior to that date. The government activity at issue here — DHS's reinterpretation of privacy commitments to the EU — raises serious questions about how DHS will implement privacy safeguards and address the privacy concerns that caused controversy even under the more protective 2004 agreement. Thus, there is a particular urgency for the public to obtain information about DHS's construction of the Undertakings under the new agreement, as well as the effectiveness of the measures in place to secure passengers' data privacy. According to the Associated Press, the "arduous" negotiations to reach the interim agreement "reflected deep divisions between the United States and the European Union over anti-terror measures and to what length governments should go in curbing personal freedoms to prevent attacks." Associated Press, *Deal Reached on Passenger Data*, Oct. 6, 2006. As Reuters noted:

> EU lawmakers raised worries that Washington was riding roughshod over data protection concerns in its quest after the September 11, 2001 attacks to further a "war on terrorism" whose tactics many Europeans question. One Greek left-wing deputy accused the EU of having "totally caved in" to U.S. pressure.

Reuters, *US., Europe Reach Deal on Air Passenger Data*, Oct. 6, 2006. These issues have

attracted substantial media interest in recent days.  In fact, Google News search for "privacy and 'passenger data'" returns about 621 results from news outlets throughout the world (see first page of Google News search results attached).

Indeed, the Department itself has recognized both the newsworthiness of this matter and the importance of informing the public of developments in its negotiations with the EU.  On September 30, 2006, the Department issued a press release containing a statement from Secretary Chertoff concerning the negotiations.[6]

The purpose of this request is to obtain information directly relevant to DHS's guidelines on the handling of EU-US passenger data before July 31, 2007, when the temporary agreement is set to expire.  The records requested involve the manner in which DHS is construing its policies on this matter, and clearly meet the standard for expedited processing.  There is clearly "an urgency to inform the public" about the Department's policies with respect to this issue in order to facilitate a full and informed public debate on the U.S. position in the upcoming bi-lateral negotiations.

Further, as I explain below in support of our request for "news media" treatment, EFF is "primarily engaged in disseminating information."

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a representative of the news media pursuant to the FOIA and 6 C.F.R. § 5.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[7]  One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[8]  To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 40,681,430 hits in September 2006 — an average of 56,501 per hour.  The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990.  The EFFector currently has more than 77,000 subscribers.  A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes a blog that highlights the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in

---

[6] This press release is available at http://www.dhs.gov/xnews/releases/pr_1159893986311.shtm.
[7] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Oct. 16, 2006).
[8] *Id.*

3

technology. It also provides miniLinks, which direct readers to other news articles and commentary on these issues. DeepLinks had 538,297 hits in September 2006.[9]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded more than 1,300 times from EFF's web site last month.

**Request for a Public Interest Fee Waiver**

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 6 C.F.R. § 5.11(k). To determine whether a request meets this standard, Department of Homeland Security components determine whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 6 C.F.R. §§ 5.11(k)(i), (ii). This request clearly satisfies these criteria.

First, DHS's handling of passenger data from EU-U.S. flights concerns "the operations or activities of the government." 6 C.F.R. § 5.11(k)(2)(i). DHS is a government agency, and its use of passenger data to make determinations about travelers unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 6 C.F.R. § 5.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on the manner in which DHS uses passenger data to screen travelers entering the United States, as well as the subsequent retention,

---

[9] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

uses, and disclosures of that data.

Third, the requested material will "contribute to public understanding" of DHS's handling of EU-U.S. passenger data. 6 C.F.R. § 5.11(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of DHS's passenger data policies, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of how DHS handles EU-U.S. passenger data. 6 C.F.R. § 5.11(k)(2)(iv) (internal quotation marks omitted). Disclosure of the requested information will help inform the public about the contours of the new agreement and DHS's interpretation of the Undertakings, as well as contribute to the public debate about the adequacy of these policies under EU law.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 6 C.F.R. § 5.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 12. As the FOIA provides, I will anticipate a determination on our request for expedited processing within ten (10) calendar days.

Under penalty of perjury, I hereby affirm that the foregoing is true and correct to the best of my knowledge.

Sincerely,

Marcia Hofmann
Staff Attorney

hofmann@gmail.com | My Account | Sign out



Web · Images  Video  **News**  Maps  more »

privacy and "passenger data"    [Search News]  [Search the Web]    Advanced news search
Preferences

Results 1 - 10 of about 621 for **privacy and passenger data**. (0.06 seconds)
Sorted by relevance   Sort by date

**Top Stories**

**World**

**U.S.**

**Business**

**Sci/Tech**

**Sports**

**Entertainment**

·**Health**

**Most Popular**

✉ **News Alerts**

RSS | Atom
About Feeds

Mobile News

About
Google News

### EU-US deal on airline passenger data deal could set world standard ...
International Herald Tribune, France - 5 hours ago
... The agreement, reached after months of wrangling over **privacy** rights, gives American law enforcement agencies continued access to **passenger data** on US-bound ...
US to seek more leeway on air passenger records Washington Post
Deal sealed over air passenger data release The Australian
EU formally signs new trans-Atlantic air **passenger data** deal with ...
International Herald Tribune
Raw Story
all 36 news articles »

### EU signs interim air **passenger data**-sharing deal with US
JURIST - 16 hours ago
... information [Reuters report; DHS press release] without violating EU **privacy** laws ... of Homeland Security [official website] to ask for **passenger data**, rather than ...

### US wants more freedom on use of EU air **passenger data**
EUobserver.com, Belgium - 32 minutes ago
... airlines to provide US authorities with 34 types of **passenger data**, including names ... In return, the US has committed to respect **privacy** protection safeguards ...

### EU: the air **passenger data** transfer agreement has been
Avionews, Italy - 5 hours ago
... airlines will keep on communicating passengers' personal data to the American security authorities, which undertook to warrant European citizens' **privacy**. ...

### EU Parliament To Fight **Passenger Data Privacy** Agreement
CSO, MA - Oct 12, 2006
... parliamentarians are gearing up for a fight over data **privacy**, after justice ... signed a new temporary agreement to pass over airline **passenger data** to American ...

### US, Europe to Share Air **Passenger Data**
AMTOnline.com, MD - Oct 9, 2006
... Friday on sharing trans-Atlantic air **passenger data** for anti-terrorism investigations, concluding arduous talks that highlighted divisions over **privacy** rights. ...

# Attachment B

*to the Declaration of Vania T. Lockett*



U.S. Department of Homeland Security
Arlington, Virginia 22202

*Privacy Office DHS-D3*

November 1, 2006

MEMORANDUM FOR: Richard Chovanec, Acting FOIA Officer, CBP

FROM:                Catherine M. Papoi
                     Acting Director, Departmental Disclosure & FOIA

SUBJECT:             **DHS/OS/PRIV 07-90/ Hofmann request**

Attached is a FOIA request received at the DHS FOIA/PA office. The requester is seeking the
following DHS records from May 30, 2006 to the present:

1. All correspondence from DHS officials to European Union officials concerning the transfer
   and use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees
   interpreting or providing guidance on how to interpret the undertakings

3. Records describing how passenger data transferred to the U.S. under the temporary
   agreement is to be retained, secured, used disclosed to other entities, or combined with
   information from other sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition,
   maintenance and use of passenger data from EU citizens.

Upon review of the subject matter, I have determined some of this information would be under
your purview.  Please also note that the requester has requested a fee waiver as well as expedited
processing.  We have notified the requester that your office will make a determination on these
requests upon receipt of the FOIA request.  Please respond directly to the requester.

The requester has been notified of this transfer.  A copy of the transmittal letter is attached.

**U.S. Department of Homeland Security**
Arlington, Virginia 22202



*Privacy Office DHS-D3*

November 1, 2006

MEMORANDUM FOR: Janet Winslow, Office of the Executive Secretariat
Nicolle Sciara, Office of the Under Secretary for Policy

FROM:                    Catherine M. Papoi
Acting Director, Departmental Disclosure & FOIA

SUBJECT:                 **DHS/OS/PRIV 07-90/Hofmann**

Attached is a FOIA request received at the DHS FOIA/PA office.  The requester is seeking the following DHS records from May 30, 2006 to the present:

1. All correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the undertakings

3. Records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used disclosed to other entities, or combined with information from other sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition, maintenance and use of passenger data from EU citizens.

Please search for responsive records within your office. If you locate responsive records within your office, please review them in accordance with the FOIA for the purpose of any release recommendations. We will need two sets of the responsive records sent to our office. One set needs to be clean and unedited without any notations. The other set can have notations and highlighted sections on it with any withholding recommendations. In addition, please advise if no responsive records are found.

You are welcome to provide an accompanying memo indicating what information you wish for us to consider for withholding, and why.  We will then review the documents and share with you our release determinations before making a release to the requester.

Please return the complete FOIA package to me at the above address for processing and response to the requester. Due to the statutory time constraint, please return to my office by COB November 15, 2006. Please give us a call with any questions.

Attachment:  Request

# Attachment C

*to the Declaration of Vania T. Lockett*



U.S. Department of Homeland Security
Arlington, Virginia 22202

*Privacy Office DHS-D3*

November 22, 2006

MEMORANDUM FOR: Erica Perel, FOIA Officer, OGC
Catrina Pavlik, FOIA Officer, TSA

FROM:               Catherine M. Papoi, J .D., Deputy Chief FOIA Officer
Director, Disclosure & FOIA

SUBJECT:            **DHS/OS/PRIV 07-90/ Hofmann request**

Attached is a FOIA request received at the DHS FOIA/PA office. The requester is seeking the
following DHS records from May 30, 2006 to the present:

1.  All correspondence from DHS officials to European Union officials concerning the transfer
    and use of passenger data from air carriers to the US for prescreening purposes.

2.  All correspondence from DHS officials to U.S. government officials or employees
    interpreting or providing guidance on how to interpret the undertakings

3.  Records describing how passenger data transferred to the U.S. under the temporary
    agreement is to be retained, secured, used disclosed to other entities, or combined with
    information from other sources.

4.  Complaints received from EU citizens or official entities concerning DHS acquisition,
    maintenance and use of passenger data from EU citizens.

Upon review of the subject matter, I have determined some of this information would be under
your purview.  Please also note that the requester has requested a fee waiver as well as expedited
processing.  Please respond directly to the requester.



**U.S. Department of Homeland Security**
Arlington, Virginia 22202

**Homeland Security**

*Privacy Office DHS-D3*

November 27, 2006

MEMORANDUM FOR:   Toby Levin, Senior Advisor, Privacy Office
John Kropf, Director of International Privacy Programs

FROM:   Catherine M. Papoi, J.D.
Deputy Chief FOIA Officer; Director, Disclosure & FOIA

SUBJECT:   **DHS/OS/PRIV 07-90/Hofmann**

Attached is a FOIA request received at the DHS FOIA/PA office. The requester is seeking the following DHS records from May 30, 2006 to the present:

1. All correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the undertakings.

3. Records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used, disclosed to other entities, or combined with information from other sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition, maintenance and use of passenger data from EU citizens.

Please search for responsive records within your office. If you locate responsive records within your office, please review them in accordance with the FOIA for the purpose of any release concerns. We will need two sets of the responsive records sent to our office. One set needs to be clean and unedited without any notations. The other set can have notations and highlighted sections on it with any withholding concerns. In addition, please advise if no responsive records are found.

You are welcome to provide an accompanying memo indicating what information you wish for us to consider for withholding, and why. We will then review the documents and share with you our release determinations before making a release to the requester.

Please return the complete FOIA package to me at the above address for processing and response to the requester. Due to the statutory time constraint, please return to my office by COB December 1, 2006. Please give us a call with any questions.

Attachment: Request

# Attachment D

*to the Declaration of Vania T. Lockett*

**Coleman, John (CIV)**

| | |
|---|---|
| **From:** | Adams, Frances G [Frances.G.Adams@dhs.gov] |
| **Sent:** | Wednesday, October 10, 2007 12:39 PM |
| **To:** | Coleman, John (CIV) |
| **Subject:** | FW: EFF 07-90 PNR Request |
| **Attachments:** | 07-90 Request.pdf |

Frances G. Adams, II
Attorney Advisor
Office of the General Counsel
Department of Homeland Security
Telephone:  (202) 447-3523
Cell Phone:  (202) 360-5607
Fax:  (202) 447-3111

*This communication, along with any attachments, is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited.  If you received this message in error, please reply immediately to the sender and delete this message.  Thank You.*

**From:** Gramian, Nikki [mailto:nikki.gramian@dhs.gov]
**Sent:** Tuesday, October 09, 2007 1:38 PM
**To:** Adams, Frances G
**Cc:** Gallo, Katherine
**Subject:** FW: EFF 07-90 PNR Request
**Importance:** High


In response to your previous email asking how I got the FOIA request for PNR records from EFF, below is the email from Vania Lockett enclosing the FOIA request.  I then forwarded the request to all of our Offices to search and specifically directed them to look for records from **<span style="color:red">May 30, 2006</span>** to the date of the search.  I remember specifically discussing the request because EFF indicated "all agency records from May 30, 2006 to present".  So, I wanted the search to be limited to that time frame only.

-----Original Message-----
From: Gramian, Nikki
Sent: Monday, January 29, 2007 12:07 PM
To: Deffer, Frank; Okonski, Alan; Stulginsky, Edward; Ellice, Douglas; Adler, Michelle; Segner, Mona; Johnson, Denise
Cc: Gallo, Katherine; Reback, Richard
Subject: FW: EFF 07-90 PNR Request
Importance: High


Dear FOIA Contacts:

Attached is another FOIA request that I received from the Dept.

This request is also in litigation. The request concerns information we may have on the "Passenger Name Record".  Kindly search for any responsive records for the enumerated items on page 2 of the attached PDF request.


-----Original Message-----
From: Lockett, Vania [mailto:Vania.Lockett@dhs.gov]
Sent: Friday, January 26, 2007 8:17 AM
To: Gramian, Nikki
Cc: Clark-moe, Loren <CTR>; Papoi, Catherine
Subject: EFF 07-90 PNR Request

10/12/2007

Nikki,

I was told that you needed a copy of the EFF 07-90 request for Passenger
Name Record documents.  The request is attached.  Let me know if you
have any questions.  Thanks.

Vania



U.S. Department of Homeland Security
Arlington, Virginia 22202

*Privacy Office DHS-D3*

March 26, 2007

MEMORANDUM FOR: Reginald Hudson, FOIA Officer, OPS and I&A

FROM:                    Vania T. Lockett
                         Associate Director, Disclosure & FOIA Operations

SUBJECT:                 **DHS/OS/PRIV 07-90/Hofmann request**

Attached is a FOIA request received at the DHS FOIA/PA office. The requester is seeking the following DHS records from May 30, 2006 to the present:

1. All correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the undertakings

3. Records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used disclosed to other entities, or combined with information from other sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition, maintenance and use of passenger data from EU citizens.

During the course of processing this request, it has come to our attention that some of this information would be under your purview. Please search for responsive records within your office. If you locate responsive records within your office, please review them in accordance with the FOIA for the purpose of any release concerns.

As this request is currently in litigation, all responses must be reviewed by the DHS Office of the General Counsel prior to submission. Accordingly, our office will coordinate all responses to the FOIA request. Therefore, we are asking that you forward any responsive documents to our office for review. We will need two sets of the responsive records: one set should be unedited, and one set should contain I&A's recommended redactions.

Please do not correspond directly with the requester concerning this case. If you have any questions, you may contact me at 571-227-4146.

**U.S. Department of Homeland Security**
Washington, DC 20528



*Privacy Office*

July 23, 2007

MEMORANDUM FOR:  Catrina Pavlik-Keenan
                 FOIA Officer, U.S. Immigration and Customs Enforcement (ICE)

FROM:            Vania T. Lockett
                 Associate Director, Disclosure & FOIA Operations

SUBJECT:         **DHS/OS/PRIV 07-90/Hofmann request**

Attached is a FOIA request received at the DHS FOIA/PA office. The requester is seeking the following DHS records from May 30, 2006 to the present (October 31, 2006):

1. All correspondence from DHS officials to European Union officials concerning the transfer and use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees interpreting or providing guidance on how to interpret the undertakings

3. Records describing how passenger data transferred to the U.S. under the temporary agreement is to be retained, secured, used disclosed to other entities, or combined with information from other sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition, maintenance and use of passenger data from EU citizens.

During the course of processing this request, it has come to our attention that some of this information would be under your purview.  Please search for responsive records within your office.  If you locate responsive records within your office, please review them in accordance with the FOIA for the purpose of any release concerns.

As this request is currently in litigation, all responses must be reviewed by the DHS Office of the General Counsel prior to submission.  Accordingly, our office will coordinate all responses to the FOIA request.  Therefore, we are asking that you forward any responsive documents to our office for review.  We will need two sets of the responsive records:  one set should be unedited, and one set should contain ICE's recommended redactions.  In order to meet production deadlines imposed by the court, we must receive your response by August 6, 2007.

Please do not correspond directly with the requester concerning this case.  If you have any questions, you may contact me at 703-235-0790.

# Attachment E

*to the Declaration of Vania T. Lockett*

**U.S. Department of Homeland Security**
Arlington, Virginia 22202



*Privacy Office DHS-D3*

November 1, 2006

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009

Re: **DHS/ŌS/PRIV 07-90/Hofmann request**

Dear Ms. Hofmann:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the Department of
Homeland Security (DHS), dated October 20, 2006, seeking the following DHS records from May 30,
2006 to the present:

1. All correspondence from DHS officials to European Union officials concerning the transfer and
   use of passenger data from air carriers to the US for prescreening purposes.

2. All correspondence from DHS officials to U.S. government officials or employees interpreting or
   providing guidance on how to interpret the undertakings.

3. Records describing how passenger data transferred to the U.S. under the temporary agreement is
   to be retained, secured, used disclosed to other entities, or combined with information from other
   sources.

4. Complaints received from EU citizens or official entities concerning DHS acquisition,
   maintenance and use of passenger data from EU citizens.

We are holding your fee waiver request in abeyance pending the quantification of responsive records. In
the event that your fee waiver request is denied, we shall charge you for records in accordance with the
DHS Interim FOIA regulations as they apply to non-commercial requestors. As a non-commercial
requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free, as are
the first two hours of search time, after which you will pay the per quarter-hour rate of the searcher. We
will construe the submission of your request as an agreement to pay up to $25.00. You will be contacted
before any further fees are accrued.

As it relates to your request for expedited treatment, your request is denied. Pursuant to 5 U.S.C. §§552
(a)(6)(E)(i), each agency shall promulgate regulations providing for expedited processing of records.
Accordingly, §5.5(d) of the DHS Interim FOIA and Privacy Act regulations, 6 C.F.R. Part 5, addresses
the Department's criteria for granting expedited treatment. You do not qualify for either category.
Clearly, the lack of expedited treatment in this case will not pose an imminent threat to the life or physical
safety of an individual. In addition, you are not primarily engaged in the disseminating of information to
the public, nor have you detailed with specificity why you feel there is an urgency to inform the public
about this topic. This urgency would need to exceed the public's right to know about government activity

generally. Finally, you did not offer any supporting evidence of public interest that is any greater than the public's general interest in the transfer and use of passenger name data.

If you deem the decision to deny expedited treatment of your request an adverse determination, you may exercise your appeal rights. Should you wish to do so, you must send your appeal within 60 days of receipt of this letter to the following address: Office of General Counsel, Department of Homeland Security, Washington, D.C. 20528, following the procedures outlined in Subpart A, Section 5.9, of the DHS Regulations. Your envelope and letter should be marked "Freedom of Information Act Appeal." Copies of the DHS regulations are available at: http://www.dhs.gov/dhspublic/interapp/editorial/editorial_0318.xml.

In addition, we are referring your request to the Acting FOIA Officer for U.S. Customs and Border Protection (CBP), Richard Chovanec, (Mint Annex-5th Floor) 1300 Pennsylvania Avenue, N.W., Washington, D.C. 20229, who will forward your request on for processing to the appropriate office within CBP. Please note that our decision regarding your request for a fee waiver and expedited processing applies to this office only, and CBP will issue a separate determination upon receipt of your request.

As it relates to this office, your request has been assigned reference number **DHS/OS/PRIV 07-90/Hofmann request**. Please refer to this identifier in any future correspondence. We have queried the appropriate component of DHS for responsive records. If any responsive records are located, they will be reviewed for determination of releasability.

Per §5.5(a) of the DHS FOIA regulations, 6 C.F.R. Part 5, the Department processes FOIA requests according to their order of receipt. We will make every effort to comply with your request in a timely manner; however, there are currently 61 open requests ahead of yours. Nevertheless, please be assured that one of the processors in our office will respond to your request as expeditiously as possible.

Sincerely,

Catherine M. Papoi
Acting Director, Departmental Disclosure & FOIA

# Attachment F

*to the Declaration of Vania T. Lockett*

 **Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

Rec'd
11-29

November 21, 2006

**BY FACSIMILE – 571-227-4171**

Associate General Counsel
Office of General Counsel
Department of Homeland Security
Washington, DC 20528

### RE: <u>Freedom of Information Act Appeal: DHS/OS/PRIV 07-90</u>

To Whom It May Concern:

This letter constitutes an appeal pursuant to 5 U.S.C. § 552(a)(6)(E)(ii)(II). The
Electronic Frontier Foundation ("EFF") appeals an initial determination issued on
November 1, 2006, by Catherine M. Papoi, Acting Director, Departmental Disclosure &
FOIA, with respect to the above-numbered request (attached hereto). Specifically, Ms.
Papoi denied EFF's request to be treated as a "news media" requester for purposes of fee
assessments, and denied its request for expedited processing of its FOIA request.

<u>Entitlement to "News Media" Fee Assessment</u>

In her letter, Ms. Papoi stated that unless EFF is granted a fee waiver, "we shall charge
you for records in accordance with the DHS Interim FOIA regulations as they apply to
non-commercial requestors," *i.e.*, fees will be assessed for both search and duplication.
Ms. Papoi further states that the agency "will construe the submission of your request as
an agreement to pay up to $25.00." By this letter, EFF is notifying the agency that it does
*not* agree to pay *any* fees related to search time.

In our request letter of October 20, 2006, we provided extensive information in support of
EFF's entitlement to "news media" status for purposes of fee assessments. That letter is
incorporated herein by reference. In order to update the information we previously
submitted, I am attaching hereto a copy of EFF's most recent newsletter, which includes
coverage and analysis of issues such as electronic voting problems in the recent mid-term
election, new developments in intellectual property law, a Federal Register notice
published by DHS, and legislative and judicial consideration of the National Security
Agency's surveillance program. I also note that since the newsletter was published last
week, EFF's news blog (www.eff.org/deeplinks/) has covered additional news items,
including a decision issued yesterday by the California Supreme Court concerning
liability for information posted on the Internet. It is clear that this material, which EFF
publishes on a regular and continuous basis, constitutes "news" within the meaning of the
agency's regulations. 6 C.F.R. § 5.11(b)(6) ("The term 'news' means information that is
about current events or that would be of current interest to the public."). EFF's
publication of this material, *inter alia*, clearly qualifies it for classification as a "news

FOIA Appeal, DHS/OS/PRIV 07-90
November 21, 2006
Page two

media" entity within the meaning of the regulations. *Id.* ("Examples of news media
entities include . . . publishers of periodicals . . . who make their products available for
purchase or subscription by the general public.").

<u>Entitlement to Expedited Processing</u>

Ms. Papoi denied EFF's request to expedite the processing of its FOIA request on two
grounds: 1) that EFF is "not primarily engaged in the disseminating of information to the
public," and 2) that EFF has not "detailed with specificity why . . . there is an urgency to
inform the public" about the Department's negotiations with the European Union with
respect to the transfer of airline passenger data. With respect to the dissemination issue, I
incorporate by reference the information we have provided with respect to EFF's
entitlement to "news media" status.

As for the "urgency" issue, Ms. Papoi asserted that EFF has not "offer[ed] any evidence
of public interest that is greater than the public's general interest in the transfer and use of
passenger name data." In appealing from that determination, I reiterate and incorporate
the information initially provided to the agency in support of EFF's FOIA request. In
addition, and to update the relevant "evidence," I note that Secretary Chertoff delivered a
speech to the Federalist Society on November 17, in which he saw fit to highlight the
dispute between the United States and the EU on passenger data. *See*
http://www.dhs.gov/xnews/speeches/sp_1163798467437.shtm. The full text of that
speech is incorporated herein by reference, and I specifically note the Secretary's
acknowledgement that the privacy issues surrounding the transfer of passenger data "led
to a very substantial debate." *See also* Reuters, "Chertoff says U.S. threatened by
international law," November 17, 2006 (attached hereto). It is precisely the "substantial
debate" the Secretary noted that establishes the public interest in the requested material.
EFF is clearly entitled to the expedited processing of its request.

As the FOIA and DHS regulations require, I look forward to your expeditious resolution
of this appeal. Feel free to contact me at (202) 797-9007 ext. 10 if I can provide you with
additional information.

Sincerely,

David L. Sobel
Senior Counsel

attachments

# Attachment G

*to the Declaration of Vania T. Lockett*

U.S. Department of Homeland Security
Arlington, Virginia 22202



Homeland
Security

*Privacy Office DHS-D3*

December 15, 2006

Ms. Marcia Hofmann
Electronic Frontier Foundation
1875 Connecticut Avenue, N.W.
Suite 650
Washington, DC 20009

Re:  **DHS/OS/PRIV 07-90/Hofmann request**

Dear Ms. Hofmann:

This is in further response to your Freedom of Information Act (FOIA) request to the
Department of Homeland Security (DHS), dated October 20, 2006, seeking the following DHS
records from May 30, 2006 to the present:

1.  Emails, letters, reports or other correspondence from DHS officials to European Union
    officials concerning the transfer and use of passenger data from air carriers to the US for
    prescreening purposes;

2.  Emails, letters, statements, memoranda or other correspondence from DHS officials to
    U.S. government officials or employees interpreting or providing guidance on how to
    interpret the undertakings;

3.  Records describing how passenger data transferred to the U.S. under the temporary
    agreement is to be retained, secured, used disclosed to other entities, or combined with
    information from other sources; and

4.  Complaints received from EU citizens or official entities concerning DHS acquisition,
    maintenance and use of passenger data from EU citizens.

Regarding your request No. 1, for "emails, letters, reports, or other correspondence from DHS
officials to European Union officials concerning the transfer and use of passenger data from air
carriers to the US for prescreening purposes," we have interpreted that request in light of
Requests 2, 3 and 4 as referring to Passenger Name Record (PNR) data.

We have queried the DHS Office of the Executive Secretariat, the DHS Office of Policy, and the
DHS Privacy Office for records responsive to your request.  In addition, we have referred your
request to U.S. Customs and Border Protection, the DHS Office of the General Counsel, and the
Transportation Security Administration for direct response.  If there are any additional
components that you would like us to search, please advise this office.  A list of DHS
components may be found at http://www.dhs.gov/xabout/structure/index.shtm.

In our November 1, 2006 acknowledgement letter, we indicated that we were holding your public interest fee waiver request in abeyance pending the quantification of responsive records. Subsequently, our office located numerous records necessitating a determination on your fee waiver request. I have reviewed your October 20, 2006 letter thoroughly and your arguments that EFF is entitled to a blanket waiver of all fees associated with this FOIA request. I have determined that you have not presented a convincing argument that EFF is entitled to a waiver of fees. Other than broad generalizations, you have not demonstrated with the requisite specificity that public interest on this issue exceeds a general level of interest in the operations and activities of a government entity or how disclosure will enlighten the public on data usage and contribute to an understanding of government operations or activities. Additionally, you have not sufficiently revealed how the requested information will be widely distributed, other than the nebulous, "EFF will make the information it obtains under the FOIA available to the public and the media through its website and newsletter..." nor have you presented evidence of a unique capability to educate the public beyond EFF's constituency and similar groups which have the same concerns. Because of these reasons, I have determined that to furnish the information to EFF at no cost does not outweigh the burden that will be placed on our components in supplying the records. Therefore, I am denying the request for a waiver of fees.

Provisions of the Act allow us to recover part of the cost of complying with your request. We shall charge you for records in accordance with the DHS Interim FOIA regulations as they apply to media requestors. As a media requestor you will be charged 10-cents a page for duplication, although the first 100 pages are free. As the duplication fees are likely to exceed the $25.00 minimum, we need a fee payment commitment by December 29th. We initially indicated that each DHS component would make independent determinations on your various treatment requests. Please be advised that our office is making the overall determinations on these issues.

You have the right to appeal the determination to deny you a fee waiver. Should you wish to do so, you must send your appeal within 60 days of receipt of this letter by writing to the following address: Office of the General Counsel, Department of Homeland Security, Washington, D.C. 20528. Your envelope and letter should be marked "Freedom of Information Act Appeal." The implementing Department Regulations establish the criteria under which the FOIA is administered. Copies of the FOIA and Regulations are available at www.dhs.gov.

Please refer to the above mentioned identifier in any future correspondence.

Sincerely,

Catherine M. Papoi, J.D.
Deputy Chief FOIA Officer
Director, Disclosure & FOIA

Cc:     Rebecca Hollaway, CBP
        Michael Russell, OGC
        Howard Plofker, TSA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:06CV01988 |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY, ) | |
| ) | |
| Defendant. ) | |

## DECLARATION OF PAUL ROSENZWEIG

I, Paul Rosenzweig, hereby declare and state as follows:

(1) I am the Deputy Assistant Secretary for Policy for the Department of
Homeland Security (DHS). Washington, D.C. 20528. I assumed this position in July
2007.

(2) Prior to assuming this position, I served as Counselor to the Assistant
Secretary for Policy (from October 2005 to July 2007), as Acting Assistant Secretary for
International Affairs (from October 2006 to July 2007), and as Acting Assistant Secretary
for Policy Development (from March 2006 to August 2006). Before joining the
Department of Homeland Security in October 2005 I served as Chairman of the Data
Privacy and Integrity Advisory Committee, a federal advisory committee chartered by
DHS.

(3) My current responsibilities at DHS involve comprehensive responsibility for
managing the development of policy within the Department, as the immediate
subordinate of the Assistant Secretary with primary responsibility for this task. The

range of issues I address on a daily basis spans the gamut of the Department's authorities

and includes: immigration policy; refugee and asylum issues; emergency preparedness;

law enforcement; counter-terrorism planning; radicalization; maritime trade and cargo;

visa policy; biological, chemical and radiological threats; foreign financial investments;

identification and screening policies; private sector initiatives; and international relations,

generally, as well as consideration of international information sharing agreements such

as the passenger name record (PNR) agreements with the European Union (EU) and the

European Commission (EC).

(4)  Based upon my positions and responsibilities at DHS, I am therefore familiar

with the negotiations with the EU and the EC regarding PNR data and the Freedom of

Information Act request which is the subject of this litigation.  I make this declaration

based upon my personal knowledge, and on information I have received in the

performance of my official duties.

(5)  The Office of Policy was created on October 17, 2005 as part of a major

reorganization at the Department of Homeland Security.  At the time of its creation, the

Office did not have a Freedom of Information Act (FOIA) processor.  It was not until late

2006 that it became apparent that the Office of Policy needed someone responsible for

FOIA issues as the office quickly expanded and as it received its first substantial FOIA

requests.  Initially, our Executive Secretary was asked to handle these responsibilities;

however, with the growth in the number and complexity of FOIA requests, it became

apparent that we needed a designated FOIA officer.  We initially posted a vacancy

announcement for a FOIA officer on June 19, 2007.  Our initial candidate withdrew, thus

we had to re-advertise and recruit another candidate.  We recently hired a FOIA officer

who will begin on October 14, 2007. She will be responsible for handling and tracking all FOIA issues for the Office of Policy.

(6) I have been involved in the negotiations on passenger name record (PNR) data with the European Union (EU) and the European Commission (EC) since October 2005, when preliminary discussions began in anticipation of a decision of the European Court of Justice (a decision that was eventually issued in May 2006 and which required negotiation of a new PNR agreement). I have traveled to Europe on numerous occasions to participate in face-to-face negotiations, and have also participated in several video and telephone conferences with the EU and the EC. Based upon my interaction with those in the EU and EC with whom the discussions and negotiations concerning PNR were taking place, I and other US negotiating personnel clearly understood that the negotiations were to be considered confidential, and not releasable to the public. Disclosure of these materials would undermine the U.S. Government's commitment to our negotiating partners that the negotiations would be confidential.

(7) The United States drafted numerous internal documents regarding the negotiations with the European Union. A number of these documents laid out the goals of the United States in the negotiations, and contained discussions of how we might best achieve those goals. Many of these documents discussed the personalities of EU and EC personnel, and analyzed how the United States might best approach the particular EU/EC negotiators in order to achieve its goals. Others identified negotiating vulnerabilities. In other words, many of our internal documents were aimed at a strategy to maximize our negotiating position with the EU and EC. Release of these documents would harm our relations with the EU and EC, including future negotiations in other areas, as the

documents would allow the EU and EC to gain insight into how the United States approached the EU and EC on the issue of PNR data.

(8) After negotiating the Interim Agreement regarding PNR with the EU during the period of May-October 2006 (the agreement was formally completed on October 19, 2006), the Office of Policy at DHS was required to immediately begin planning for negotiations for a new agreement, since the Interim Agreement was set to expire on July 31, 2007. The primary negotiators from DHS for the new agreement were Assistant Secretary Stewart Baker, Michael Scardaville (Deputy Director for European & Multilateral Affairs), and me. These same people were also the primary negotiators for the Interim Agreement. Consequently, while these individuals would be the most likely to have documents responsive to the plaintiff's FOIA request, they were also occupied with detailed efforts to negotiate a new agreement. By way of example, between September 2006 and July 2007, I personally traveled to Europe on at least eight occasions and PNR was the subject of discussion (and often the sole topic of discussion) at virtually all of the meetings I had while on travel. Assistant Secretary Baker and Mr. Scardaville made fewer personal trips to Europe, but each spent a commensurate amount of time on the negotiations: indeed, Mr. Scardaville estimates that in the 15 month period from May 2006 to July 2007 he spent nearly 60% of his time directly on these negotiations, in addition to his other duties and that during the periods of most intense negotiations in the months immediately preceding each of the two agreements he devoted on the order of 85-90% of his time to our discussions with Europe.

(9) I first became aware of the FOIA request of Electronic Frontier Foundation which is the subject of this litigation shortly after it was filed. Without a FOIA processor,

our Office of Policy was not well equipped to respond to the FOIA request, and we sought the assistance of the Office of the General Counsel. Our response was further complicated by our mistaken understanding that most of the documents responsive to the request would be exempt from disclosure because we had come to an understanding with the EU and EC that our negotiations would be kept confidential. In particular, at the time of the initial request, we had not been advised that we had to classify such documents in order to give effect to our mutual understanding. It was not until the latter part of May, 2007, or the first part of June, that I came to understand that to give effect to our understanding with the EU and the EC, we had to take certain formal steps and classify the documents.

(10) Since we were at that time nearing the end of detailed, sometimes contentious negotiations concerning a new agreement with the EU on PNR data, we did not wish to side-track or complicate the negotiations by bringing up the issue of the confidentiality of documents and the need to formalize our understandings. It was not until we completed negotiations on the new agreement on July 26, 2007, that I was able to turn my attention to the issue of the confidentiality of our negotiating documents. I then forwarded a letter to the EU on July 30, 2007 memorializing and clarifying our mutual understanding of the confidentiality of the documents. (Attachment A)

(11) I checked on the status of my letter on August 6, 2007 when I was in Brussels, and was told that the confidentiality understanding would require a formal approval by the European Council. However, the Council was in recess for the August holidays, and would not reconvene until September. (Attachment B). We have been advised that the understanding came before the Council on September 18 and was

5

approved. On October 2, 2007, we received a communication from the European Commission that "The European Union shares your understanding regarding the confidentiality of the negotiation process." (Attachment C).

(12) After receiving the communication from the EC, I recommended to the Secretary of Homeland Security on October 12, 2007 that he direct the classification of documents regarding the negotiations. That request is currently pending in the Secretary's office, and seeks to have information classified primarily under Executive Order 13292. *Classified National Security Information*, section 1.4(a), "foreign government information," and section 1.4(d), "foreign relations or foreign activities of the United States." In this situation, "foreign government information" would be that provided to the United States by the EU or foreign governments regarding PNR for flights between Europe and the United States. Material which discusses specific negotiating strategies, tactics or options, including information concerning the individuals engaged in the negotiations for the EU, would be included within information relating to the foreign relations or foreign activities of the United States.

(13) If the Secretary or Deputy Secretary directs that such information be classified, the DHS Office of Security and the DHS Office of Policy will work together to identify all such information and appropriately classify it. The DHS Office of Disclosure and Freedom of Information Act Operations, along with the Office of the General Counsel, have already identified over 1,700 pages of material which needs to be reviewed for possible classification. DHS is committed to review these documents expeditiously, and provide the plaintiff, subject to appropriate FOIA exemptions, any documents, or portions of documents, which are not classified.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 12th day of October, 2007.

PAUL ROSENZWEIG

# Attachment A

*to the Declaration of Paul Rosenzweig*

**U.S. Department of Homeland Security**
Washington, DC 20528



JUL 3 0 2007

Ambassador João Vallera
Ambassador of Portugal
2012 Massachusetts Avenue NW
Washington, DC 20036

Dear Ambassador Vallera,

We are writing to set out our understanding of how documents and information relating to the passenger name record agreement (PNR) negotiations have been handled since those negotiations began. We have both proceeded on the understanding that negotiations are conducted in confidence; and, thus, the record should also be maintained in confidence. For purposes of clarity, we request confirmation of the following procedures:

- The negotiations and negotiating documents are to be held in confidence. Negotiating documents include both those documents passed between the European Union (and/or its individual members) and the United States, and those documents which are internal to either party but discuss the negotiations, such as notes of meetings or strategies. The documents and negotiations are to be provided only to (1) government officials or (2) persons outside government who participate in the party's internal consultation process and who have a need to review or be advised of the information in these documents. In the EU, this is without prejudice to mandatory disclosure of such documents in the course of judicial proceedings.

- Anyone given access to such documents will be alerted that they cannot share the documents with people not authorized to see them. These documents will be held in confidence for at least ten years after entry into force of the agreements.

- While the negotiating documents are held in confidence, both sides may mail, e-mail, fax, or discuss these documents over unsecured lines with the people mentioned above. Both sides must take reasonable steps to ensure that the documents are held in confidence.

- The United States intends to mark such documents as "Foreign Government Information – Modified Handling Authorized," and include a brief instruction following the marking on how the documents will be handled.

The policy underlying this approach is to protect the sensitive internal nature and confidentiality of documents, while at the same time allowing the two parties to develop their negotiating positions and communicate internally and with each other. We look forward to your confirmation of our understanding.

Sincerely,

Paul Rosenzweig
Acting Assistant Secretary, Office of Policy

Cc:
Ambassador John Bruton
European Union - Delegation of the European Commission to the United States of America
2300 M Street, NW
Washington, DC 20037

Acknowledged:

FOR THE EUROPEAN UNION

Name:  João Vallera
Title:  Ambassador of Portugal

# Attachment B

*to the Declaration of Paul Rosenzweig*

EMBAIXADA DE PORTUGAL

WASHINGTON

08/08/2007
NOTE: 5 7

Dear Mr. Rosenzweig,

Thank your for your letter of July 30, 2007 to Ambassador Vallera regarding the handling of PNR documents, namely concerning negotiations and negotiating documents.
As the matters therein require a formal approval by the European Council, which is now on recess and will reconvene in September, as I believe you were told during your meeting in Brussels at the beginning of the week, I am afraid our reply will have to wait until then.

Not meaning in any way to anticipate the outcome of the Council Decision, allow me nevertheless to draw your attention to the Regulation (EC) No 1049/2001 regarding public access to European Parliament, Council and Commission documents. It establishes that "the institutions shall refuse access to a document where its disclosure would undermine the protection of (a) the public interest as regards: (...) international relations". If those documents are of a sensitive nature, the period when they are protected could be up to 30 years.

Sincerely,

*[signature]*

José Costa Pereira
Chargé d'Affairs a.i.

The Honorable
Paul Rosenzweig
Assistant Secretary
US Department of Homeland Security

cc. Mr. Anthony Smallwood, Chargé D'Affairs
Delegation of the European Commission

# Attachment C

*to the Declaration of Paul Rosenzweig*

PORTUGUESE EMBASSY
WASHINGTON

NOTE: 88

Washington DC, October 2, 2007

Dear Assistant Secretary Rosenzweig,

In reply to your letter of 30 July 2007 regarding the US understanding of the confidentiality of negotiation documents relating to the Agreement between the European Union and the United States of America on the processing and transfer of passenger name record (PNR) data by air carries to the United States Department of Homeland Security (DHS), I would like to state the following.

The European Union shares your understanding regarding the confidentiality of the negotiation process. Before setting out the EU handing of documents, I think it is first important to clarify the following. The negotiations of the above Agreement were conducted by the Member State holding the Presidency of the Council, supported by the General Secretariat of the Council and assisted by the European Commission. The European Union only has obligations regarding documents held by its institutions (in this case the Council and the Commission).

With regard to any documents in the possession of the EU institutions, Regulation No 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding the public access to European Parliament, Council and Commission documents applies. This Regulation also covers e-mails.

Article 4, paragraph 1(a), third indent of the Regulation obliges the institutions to refuse public access to a document where disclosure would undermine the protection of the public interest as regards international relations.

Under this Regulation, any request for access to a document must be examined and replied to on a case-by-case basis. This is also applies with regard to any future request for access to a document related to the PNR negotiations. Obviously, such a request will always be evaluate in good faith, keeping in mind the US expectations regarding the confidentiality of negotiations documents, as expressed in your letter of 30 July 2007, and with due regard for the applicable EU legislation.

Regarding the internal handling of negotiation documents within the institutions, the normal duty of confidentiality shall apply.

To the extent that the documents concerned are only held by the authorities of the Member States that conducted the negotiations and not by an EU institution, public access and confidentiality is solely a matter regulated by the laws of those Member States.

Yours faithfully,

João de Vallera
Ambassador of Portugal

The Honorable
Paul Rosenzweig
Assistant Secretary
US Department of Homeland Security

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION** )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**DEPARTMENT OF HOMELAND**<br>**SECURITY** )<br>)<br>)<br>Defendant. )<br>) | Civil Action No. 06-1988 (ESH) |

### DECLARATION OF JOHN R. COLEMAN

I, JOHN R. COLEMAN, do hereby state and declare as follows:

1.      I am a trial attorney for the Department of Justice, Civil Division, Federal Programs Branch, and have been a trial attorney since October 2, 2006.  I am lead counsel for defendants in Civil Action No. 06-1988.  I submit this declaration in support of Defendant's Motion for Motion to Alter Or Amend the Court's April 27, 2007 Scheduling Order and for a Stay of Proceedings.  The statements herein are based on my personal knowledge and information obtained in the course of my official duties.

2.      Following the parties' status conference of April 27, 2007, and at the Court's suggestion, I contacted plaintiff's counsel Marcia Hoffman by telephone to discuss whether plaintiff would be willing to limit the scope of its FOIA request by excluding multiple drafts of agency records from its request.  Plaintiff's counsel indicated that plaintiff would not limit the scope of its request in such a manner.

I declare under penalty of perjury that the foregoing is true and correct.


Date:    October 15, 2007

                                                                        JOHN R. COLEMAN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELECTRONIC FRONTIER FOUNDATION** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1988 (ESH) |
| ) | |
| **DEPARTMENT OF HOMELAND** ) | |
| **SECURITY** ) | |
| ) | |
| Defendant. ) | |
| _____) | |

### PROPOSED ORDER

It is hereby ORDERED that defendant shall identify those records not subject to possible classification pursuant to Section 1.7(d) of Exec. Order 12,958, as amended, and continue producing such records or portions of such records not determined to merit withholding under applicable law, including 5 U.S.C. § 552(b), on a bi-weekly basis.

It is further ORDERED that defendant shall complete production of those records not subject to possible classification pursuant to Section 1.7(d) of Exec. Order 12,958, as amended, by April 30, 2008.

It is further ORDERED that defendant's obligation to produce those records that may be classified pursuant to Section 1.7(d) of Exec. Order 12,958, as amended, is stayed.

It is further ORDERED that defendant promptly notify this Court and plaintiff of its determination as to whether to classify responsive records.

_____
UNITED STATES DISTRICT JUDGE